No. 38,662

W. G. BERRY, *Appellant*, v. LEON WONDRA, et al., *Appellees*.

(246 P. 2d 282)

Opinion filed July 3, 1952.

*Harold G. Forbes,* of Eureka, argued the cause, and *Thos. C. Forbes,* of Eureka, was with him on the briefs for the appellant.

*Chas. H. Carpenter,* of Yates Center, argued the cause and was on the brief for the appellee, G. H. Mason.

The opinion of the court was delivered by

HARVEY, C. J.: This was a suit by the lessor of an oil and gas lease for a decree requiring the lessee to further develop the leased premises or for the cancellation of the lease except as to a ten-acre area about a producing well. Plaintiff has appealed from an adverse judgment.

The facts are not seriously controverted and may be summarized as follows: On and for sometime prior to June 4, 1947, W. G. Berry, hereinafter referred to as plaintiff, was the owner in fee of the Southwest Quarter of Section 35, Township 23 South, Range 13 East of the 6th Principal Meridian, situated in Woodson County, Kansas. On that date plaintiff and his wife executed and delivered to Fred B. Lewis an oil and gas lease covering the above described land for the consideration of one dollar and the covenants and agreements contained in the lease for the sole purpose of mining and operating for oil and gas, laying pipe lines, building tanks and other structures necessary to produce, care for and save any oil and gas found in the premises. It was agreed that the lease would remain in force for a term of five years from its date and as long thereafter as oil or gas was produced from the land by the lessee. By it the lessee agreed to deliver to the credit of the lessors, free of cost, one-eighth of all oil produced and saved from the premises; if no well was commenced on the land by June 4, 1948, the lease should terminate unless the lessee delivered to a named bank for the lessor $160, which would operate to secure the privilege to defer the commencement of a well for twelve months, and contained other provisions common in oil and gas leases. On July 17, 1947, Fred B. Lewis assigned the oil and gas lease to Leon Wondra, a resident of Nebraska, which assignment was duly recorded. On the same date Leon Wondra assigned the oil and gas lease to Gerald A. Mason, a resident of Oakland, California, reserving however, an overriding royalty of three-sixteenths of eight-eigths of the interest in the lease, which assignment was duly recorded, and on the same date Leon Wondra assigned an undivided one-sixteenth overriding royalty interest in the lease to Hazel G. Lewis, a resident of Greenwood County, Kansas. Later the two-sixteenths overriding royalty interest retained by Leon Wondra became subject to a lien in favor of E. E. Lamb and Clyde Hill. Each of these parties was made a defendant in the action,

but Mason alone filed an answer and will be hereinafter referred to as defendant.

Soon after the assignment of the lease to him defendant started an oil well on the premises, which was completed on October 7, 1947, as a produucing well. Soon thereafter he started another well upon the leased premises, which was completed on March 22, 1948, as a dry hole. No further development upon the lease was undertaken by defendant. It was stipulated that the Sinclair Oil & Gas Company purchased all of the oil produced from the first well drilled by defendant, and that the sum paid by the purchaser for the oil produced from the well between the dates of October, 1947, and May, 1951, amounted to $37,685.55, one-eighth of which, or $4,771.25, was paid the lessor and the $32,977.30 was paid to the lessee. At the time of the trial in August, 1951, this well was still producing seven barrels of oil per day. On June 30, 1950, plaintiff served a written notice upon defendant and the other persons who had an interest in the lease, which recited that one small well was producing on the leased premises; that for the past several years no effort had been made to develop the rest of the acreage; that plaintiff had an oil man ready, willing and able to drill upon the above premises and advised defendant that unless he further developed the acreage on or before August 20, 1950, or released the lease of record, except that portion immediately surrounding the producing well, at that date, that an action would be brought for the cancellation of the lease. The defendant received this notice promptly but did nothing further toward developing the lease within the time stated, and did not release any portion of the leased premises.

In his petition plaintiff alleged the above facts more in detail than here set out and further alleged that an oil well in which defendant claims to have an interest had been drilled on the land just north of the land described in the lease here involved which was producing oil in paying quantities; that it was apparent the undeveloped portion of the land covered by the lease here in question is underlaid with valuable deposits of oil and will produce oil in paying quantities; that the defendant has violated the implied covenants of the lease in that he has not developed or operated the leased premises for oil purposes with reasonable diligence for the mutual benefit of the lessor and lessee. The prayer was that the lease be canceled except for ten acres in a square surrounding the

producing well, and that the plaintiff have judgment for costs and such other relief as may be just and equitable. Copies of the oil lease in question and of the notice of June 20, 1950, were attached to the petition as exhibits.

The defendant Mason filed an answer in which he admitted the allegations of the petition respecting plaintiff's ownership of the land, the execution of the oil and gas lease and the assignments thereof; that he had drilled one well on the leased premises which was still producing oil in paying quantities, and that he had drilled a second well which resulted in a dry hole, and alleged "that due to the fact that there was a three-sixteenths overriding royalty outstanding it was financially impossible for him to drill additional wells as long as said over-riding interest was outstanding." He further alleged that the primary term of the lease had not expired; that the rights of the parties were governed by the lease, and denied that he had violated any express or implied covenants of the lease; denied that the well drilled on the land north of the lease indicated the lease was underlaid with oil which could be produced in paying quantities. He also alleged that due to governmental action no oil pipe or casing could be had at a reasonable price; alleged that he had operated the lease in a diligent and prudent manner for the mutual benefit of the parties; that his return from the investment would not warrant further drilling; that his investment had brought the property into value, and that it would be unjust and inequitable to cancel the lease and divest him of his property. Plaintiff's reply was a general denial.

The case was tried by the court on August 7, 1951. After the evidence was taken the court took the matter under advisement and suggested to counsel that they file briefs, which they did. On October 30, 1951, the court rendered its decision in which it found:

"1. That under the terms and provisions of the lease in question; there is no implied covenant for further development during the primary term of the lease.

"2. That even if there should be such an implied covenant, defendant has, under the circumstances and conditions set out in the evidence operated the lease in a manner sufficiently prudent to avoid the cancellation sought here."

Judgment was rendered for defendant in harmony with the findings. Plaintiff filed a motion for a new trial upon the grounds, among others, of erroneous rulings of the court and that its decision was in whole or in part contrary to the evidence. This motion was

heard by the court on December 18, 1951, and denied. Plaintiff served and filed his notice of appeal on the same date.

In this court counsel for plaintiff contend the court erred in holding "there is no implied covenant for further development during the primary term of the lease." This point is well taken.

In *Howerton v. Gas Co.*, 81 Kan. 553, 106 Pac. 47, the owner of a described tract of land, on November 20, 1902, executed an oil and gas lease thereon for a primary term of ten years and so long thereafter as either oil or gas was produced in paying quantities. It provided that a well should be drilled within a year and if gas in marketing quantities was found the lessor could use gas for domestic purposes and should receive $50 per year for each well. A well was drilled within a year and produced gas sufficient for marketing as provided. The lessor used gas for domestic purposes and the lessee used it for drilling wells on near-by leases which produced oil in marketing quantities. No other well was drilled on the lease in question, and about four years later the lessor sued to cancel the lease. The court held:

"(1) That the contract contemplated that the well should be operated and gas marketed therefrom in a reasonable time, and that other wells should be drilled and operated with reasonable diligence to utilize the lease. (2) That four years' delay, in the circumstances shown, was unreasonable. (3) That the lessors have no adequate remedy in damages, and the lease should be terminated."

Upon rehearing, 82 Kan. 367, 108 Pac. 813, the court reconsidered the question of whether damages should be allowed in lieu of cancellation and held:

"The measure of damages is the sum of $50 per year for each well from the time it ought to have been drilled."

And further held:

"If it be determined that such a rule of damages cannot be applied, an alternative decree may be entered, upon proper proof, providing that the defendant shall proceed, within a time to be fixed, as before indicated, to drill such wells as may be necessary to protect and develop the land and utilize the gas thereon, and pay for such wells as stipulated, or that the lease be canceled."

The court directed further proceedings.

In *Collins v. Oil & Gas Co.*, 85 Kan. 483, 118 Pac. 54, the oil and gas lease was for five years and so long thereafter as oil or gas was found in paying quantities. The lessee drilled five wells in which oil was found and cased them, contending the prevailing price of oil did not warrant operations. No oil was ever pumped from them.

In an action brought more than five years after the lease was executed it was held the lessors were entitled to cancellation of the lease but that the lessee had the right to remove machinery and fixtures.

In *Culbertson v. Cement Co.*, 87 Kan. 529, 125 Pac. 81, it was held (syl. 4):

"When a lessee undertakes to develop gas land and gives the lessor a rental or a royalty on the gas produced, and the contract does not specify the number of wells to be drilled, there is an implied obligation that he will fully develop the land with reasonable diligence and sink sufficient wells to secure to the lessor the gas underlying his land; . . ."

At page 535 of the opinion it was said:

"Since the number of wells to be drilled on the land was not specified there was an implied obligation on appellants to fully develop the land and put down as many wells as were necessary to secure to appellee his proportionate share of the pool of gas. (*Kleppner v. Lemon*, 176 Pa. St. 502, 35 Atl. 109; Thornton, The Law Relating to Oil and Gas, § 91.)"

In *Alford v. Dennis*, 102 Kan. 403, 170 Pac. 1005, the lease covered two tracts of land—716 acres and 220 acres—for a term of ten years and as much longer as gas or oil might be found in paying quantities. The larger tract was developed and many wells drilled thereon, but nothing was done as to the smaller tract. The court held:

"That the ordinary rule that equity will not relieve against an improvident bargain prevents an absolute forfeiture, that equity will not forfeit a contract for the mere breach of one of its implied covenants; but *held*, also, that the petition stated a cause of action for some redress, either in damages, if such be ascertainable, or in the alternative that the lessees be required to drill and develop plaintiff's land within a reasonable time pursuant to their implied covenant, under penalty of forfeiture, following the doctrine announced in the fourth paragraph of the syllabus of *Howerton v. Gas Co.*, 82 Kan. 367, 108 Pac. 813."

In *Gillet v. Investment Co.*, 111 Kan. 755, 207 Pac. 843, the lessor in an oil and gas lease assigned an undivided one-tenth interest in the lease to each of his seven children. The lessee assigned the operating clause. The implied covenants of the lease to develop fully and with diligence the oil resources of the land and to prevent the land from being drained of oil by wells on adjoining lands were broken, and the express covenant to render a stipulated oil royalty was broken. The lessor and his assigns joined in an action for damages against the lessee and his assigns. The trial court sustained a demurrer to the petition. *Held*, this was error. In the opinion (page 757) it was said:

"The lessee impliedly covenanted that he would fully develop the oil resources of the land with diligence; and impliedly covenanted that he would prevent escape of oil from the land, by drilling a sufficient number of wells to offset those drilled by others outside the lease boundaries." (Citing the *Howerton* case in 81 Kan. and one Thornton on The Law of Oil and Gas, 3d ed. 156, and other authorities.)

In *Brown v. Oil Co.*, 114 Kan. 166, 217 Pac. 286, the owner of a tract of 2,347 acres executed an oil and gas lease with a fixed term of five years and as long thereafter as gas or oil was found in paying quantities, and Brown, the lessee, was to complete a well within six months or to pay rent for each six months' period. The lessee did no development on the place until the last year of the five-year period, at which time a number of dry holes were drilled and a small amount of oil was produced, all within a certain 320 acres of the property. It was held the rights of the lessee in the 320 acres was not a sufficient excuse for a failure to develop the remaining 2,027 acres, and that a court of equity should require a reasonable exploration and development of the entire tract to be prosecuted with reasonable diligence. Citing our previous cases.

In *Webb v. Croft*, 120 Kan. 654, 244 Pac. 1033, the lessor gave an oil and gas lease for a term of five years and as long thereafter as gas or oil was found in paying quantities. There was no development until shortly before the end of the five-year period, when a producing gas well was drilled and completed. It was held that under the lease there is an implied covenant or condition that there will be reasonable development of the land and the drilling of such number of wells as circumstances warrant and as would ordinarily be required on such land in order to afford protection to the rights of both parties to the lease. Further held that the lessee had not made such development as is required under the lease and it was competent for the court to decree further development by the lessee upon reasonable or just terms and conditions. In the opinion (page 657) it was said:

"Leases of this kind contemplate exploration and development and not the bottling up of land for speculative or other purposes or the postponement of reasonable development, nor yet the limiting of development to an extent merely to prevent a declaration of forfeiture. Although not expressly mentioned in the lease, there is an implied covenant or condition that there shall be reasonable development and such operation as will protect the interests of both the lessor and lessee." (Citing the *Howerton* case in 81 Kan. 553, 106 Pac. 47, and other authorities.)

In *McCarney v. Freel*, 121 Kan. 189, 246 Pac. 500, the syllabus reads:

"The lessee of a quarter section of land under an oil and gas lease for ten years, and as much longer as mineral could be produced in paying quantities, drilled one producing oil well and one dry hole. After expiration of the definite term the district court canceled the lease, except as to a tract sufficient to operate the producing well. *Held,* the judgment was correct."

Apparently it had been argued there was no implied covenant in the lease to further develop the leased premises after the primary term named in the lease. In the opinion (p. 190) it was said:

"A lessee may not hold an entire quarter section of land with a single producing well after expiration of term, any more than he may do so before expiration of term. The implied covenant fairly to exhaust capability of the land to produce mineral, subsists. If the undeveloped portion of the land will not produce mineral in paying quantities, and the lessee would not be justified in drilling more wells, he may not continue to hold by virtue of a provision in the lease extending the term so long as oil or gas may be produced in paying quantities."

In *Greenwood v. Texas-Interstate P. L. Co.,* 143 Kan. 687, 56 P. 2d 431, it was held:

"In an oil and gas lease, under implied covenant it is the duty of the lessee to use reasonable diligence in the exploration and development of the leased premises so that the avails of production, if any, may reach the parties entitled thereto, and if some production is had during the primary term of the lease, the work of development and production must be continued with reasonable diligence and along such lines as are reasonably calculated to make extraction of oil and gas from the leased lands of mutual advantage and profit to the lessor and lessee."

In *Harris v. Morris Plan Co.,* 144 Kan. 501, 61 P. 2d 901, an oil and gas lease covered 360 acres, of which 200 acres was assigned to a third person. It was held the failure of the third person to develop his 200 acres under the implied covenants of the lease is not excused because there had been development on the unassigned 160 acres, nor because of development upon the small part of the assigned 200 acres; that under the implied covenants the work and development and production must be continued with reasonable diligence and along such lines as are reasonably calculated to make extraction of oil and gas from the leased lands of mutual advantage and profit to the lessor and lessee, and that the lessee is not warranted in not developing the leased real estate under the implied covenants of an oil and gas lease because it may not prove presently profitable to him, where there is a market for the oil and gas which may be produced and the production and sale thereof will be to the advantage of the lessor.

In *Fischer v. Magnolia Petroleum Co.*, 156 Kan. 367, 133 P. 2d 95, it was held:

"Unless otherwise provided in the instrument, there is an implied covenant by the lessee, under an oil and gas lease, that the tract will be prudently developed. Further held: Neither the lessor nor the lessee under an oil and gas lease is the sole judge of what constitutes prudent development of the tract. Whatever would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

In *Christiansen v. Virginia Drilling Co.*, 170 Kan. 355, 226 P. 2d 263, it was held:

"In the absence of provisions to the contrary, there is an implied covenant to develop with reasonable diligence, an oil and gas lease in furtherance of the interests of both the lessor and the lessee.

"Neither the lessor nor the lessee under an oil and gas lease is the sole judge of what constitutes prudent development of the lease. Whatever would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. (Following *Fischer v. Magnolia Petroleum Company*, 156 Kan. 367, 133 P. 2d 95.)"

In 93 A. L. R. p. 460, there is an extended annotation on the extent of development necessary to comply with express or implied covenants of an oil and gas lease as to development. The general rule as stated by the annotator is as follows:

"It is well settled that where the existence of oil in paying quantities is made apparent, it is the duty of the lessee to continue the development of the property and to put down as many wells as may be reasonably necessary to secure the oil, for the common advantage of both himself and the lessor." (Citing a number of cases, including several Kansas cases.)

In Summers on Oil and Gas, permanent edition, § 395, vol. 2, p. 301, it is said:

"Where a landowner grants a lease of his land for oil and gas purposes for a nominal initial consideration, and the lessee agrees to pay as return therefor a share of the oil or gas produced from the land, or a rental for each producing well, it is apparent that the principal consideration for the grant is the promise of the lessee to pay the royalties or well rentals. The payment of rents or royalties to the lessee is, however, contingent upon production. . . . Where the purpose of the lease is thus disclosed, but the lease does not itself contain express provisions creating duties in the lessee to do such acts as are necessary for the accomplishment of that purpose, the law implies them. (Citing many authorities) . . . The covenants which the law, in absence of express provision, implies on the part of the lessee, with some advantage, may be divided into five classes: . . . 3. A covenant, if oil or gas be found in paying quantities, to proceed with reasonable diligence in drilling sufficient number of wells to reasonably develop the premises." (See, also, § 398, p. 333 (*et seq.*)

In Merrill on Covenants Implied in Oil and Gas Leases, 2d edition, section 57, it is said:

"Where oil or gas is discovered in paying quantities, and, as is usually the case, there are no express provisions governing the drilling of additional wells, it is held uniformly that there is an implied covenant to drill as many wells as are reasonably necessary to develop the premises and to secure the oil or gas for the mutual benefit of the lessor and the lessee." (Citing a number of cases from Kansas and other states.)

To the same effect is the discussion in 58 C. J. S. 457 *et seq.* Also, in 24 Am. Jur. 568 *et seq.*

The authorities above cited do not constitute a complete list. Many more might be cited. None of them gives support to the view that there is no implied covenant in the ordinary oil and gas lease now in general use for further development during the primary term of the lease.

In advising counsel of its findings the trial court predicated its decision primarily upon our decision in *Rose v. Lanyon,* 68 Kan. 126, 74 Pac. 625. The case is not in point. The question of an implied covenant in the lease was not involved. The oil and gas lease in that case enumerated nine specific things the lessee should do and provided that the failure of the lessee to comply with any of them would render the lease null and void. This was followed by a provision that the lessor should be furnished gas for domestic purposes from certain wells, but nothing was said about the lease being null and void if this provision was not complied with. The action to cancel the lease was for the failure to provide gas for domestic purposes. Construing the lease, the court held that it was not within the contemplation of the parties that the lease should be canceled for that reason. The case is cited on this point in Summers on Oil and Gas, perm. ed., Vol. 2, p. 284, and in *Rose v. School District No. 94,* 162, Kan. 720, 726, 179 P. 2d 181.

Counsel for appellant next contend that the court erred in its second finding of fact to the effect that if there was an implied covenant to develop during the primary term of the lease "defendant has, under the circumstances and conditions set out in the evidence operated the lease in a manner sufficiently prudent to avoid the cancellation sought here," the specific contention being that this finding is not supported by any evidence and that all of the evidence bearing upon the question is the other way.

At the beginning of the trial it was stipulated that defendant had completed a producing oil well on the lease October 1, 1947,

and that the well was producing at the time of the trial; that early in 1948 defendant completed a second well which proved to be a dry hole and that no additional attempt had been made by defendant to further develop the lease.

The plaintiff testified, among other things, that he had had offers from other oil producers to drill on the property; that on June 30, 1950, he had made written demands on defendant for further development; that defendant had made no further attempt to develop the property; that he wanted defendant to further develop the property if he desired to do so; that if he did not so desire, to have it released so that some other person might develop it, and that there are two producing wells on the land immediately north of the land covered by the lease in question.

Lloyd Jones, called as a witness by plaintiff, testified that he was engaged in the oil and gas business; that during the last year he had drilled fourteen wells, eleven for himself, ten of which were producers, and three for other persons; that he was familiar with the lease in question, its location and the wells about it; that during the last part of 1947 and the early part of 1948 he was drilling approximately one and one-half miles south of the lease in question; that he had visited the lease in question and was familiar with the substrata; that he had had a geological survey made of the land; that he had his own geological staff and had spent several thousand dollars in that particular area having a survey made; that he was familiar with the well drilled which resulted in a dry hole and that the dry hole did not in any way condemn the acreage, due to the fact that when drilling in line a void may be found at any time; that in his opinion a reasonable and prudent operator would have further developed the property, and that as a reasonable and prudent operator he would be willing to drill the same; that he is engaged in both producing and drilling wells; that oil is found in that vicinity; that at about 1,830 feet the cost of drilling does not exceed three dollars per foot, a total of $5,400; that when production is found the expense of completing the well is about $10,000; that the cost of drilling a dry hole is about $5,400; that in his opinion a reasonable and prudent operator who had expended about $21,500 on one producer and one dry hole and had received in return oil payments for seven-eighths working interest of $32,977 would have further developed the property prior to the time of the filing of this action. He further testified that a seven-barrel well will pay off in about two and three-fourth years

and is a good investment; that the operator would still have his equipment, which is about half the cost of drilling and equipping a producing well; that the producing well on the leased property is old enough to have paid for itself twice, and the lessee would still have a producing well. He further testified the fact that the second well drilled was a dry hole would not mean anything except that it happened to be located on a hard spot in the land; that another well might be drilled at a location from it and be a producing well. He illustrated that by the fact that on the land just north of that covered by the lease in question he had drilled a dry hole and a location from it had drilled a producing well, which was still producing; that if he had this lease with its producing well he would consider further development of the lease, and he thought that most any prudent operator would do so.

Mr. H. E. Ozenberger, called as a witness by plaintiff, testified that he had been engaged in the drilling, operating and producing of oil and gas for about thirty-five years; that within the last year he had assisted in the drilling of six wells and was producing oil from twenty wells; that he had heard the evidence of the producing well on the lease in question, and that one dry hole had been drilled. He gave it as his judgment that a reasonable and prudent operator would drill more wells on the property. He testified that the one dry hole did not condemn the lease; that on almost every lease there are some dry holes and producing wells; that operators are going back and drilling on leases, some of which had been abandoned because dry holes were found, and are finding producing wells.

The defendant Mason testified that he had made no further development since March, 1948, because, first, he would like to get his original investment out; second, the potential there does not look as though it would warrant further investment at this particular time; that his opinion as to the potential was based on his experience in drilling the two wells on the lease; that if he did not get his original investment back he thought he should have the right to drill further on the property. Without laboring the point, it can be said the evidence disclosed that he had got out his original investment.

Mr. Leland Dreyer, called by defendant as a witness, testified that he was a pumper on the place and received about $23 a month for pumping the well, and that in his opinion the total cost per month for all expenses, including pulling the well when necessary, electricity and pumper's salary did not exceed $50 to $60 a month.

Fred E. Kilby, called by defendant as a witness, testified he was in the business of producing, contract drilling and developing of oil and gas and had operated in the vicinity in question since 1919; that east of the lease in question he has eight or ten producing wells; that he assisted defendant in completing the first well on the lease in question, which originally made forty barrels per day; that he was at the second well drilled by defendant on the lease in question several times and familiarized himself with the situation; that the well made but a small showing; that it was about ten feet low in the structure and that they searched for a higher spot; that the Mississippi lime is not a continuous body of formation; that fractures of it are filled with porous, soft, soluble formation and that is where the good wells are found. A location away one might drill and find a tight condition, no porosity; such wells are failures.

"Q. (By defendant's counsel). Mr. Kilby, with your knowledge of the situation out there, and from the evidence which you have heard from the witness stand, is it your opinion that a prudent operator would spend money for further development on this Mason-Berry lease at this time? A. Oh, I think perhaps that there is some possibility out there. I will answer it that way. I still don't want to answer it for somebody else. I think it is a possibility there.

"Q. (By plaintiff's counsel). Mr. Kilby, if I understand you correctly, the fact that this well to the southwest, the off-set was dry, actually in the lime formation, that might or might not prove anything? A. . . . That is right, and I will tell you, to Your Honor, . . . that quite often our dry holes give us valuable information. . . .

"Q. Now, here is a lease that has produced, according to the oil runs, has made a return of approximately thirty-three thousand dollars back to the operator? A. Nice well; good well.

"Q. Now, that would, or should more than pay all of his investment there, should it not? A. Generally, yes, it should. Unfortunately, he is hooked up wrong, like you—

"Q. Well, what you are trying to say is, unfortunately he has got some overrides? A. Yes, sir.

"Q. But you can't blame the land owner for that? A. Not at all. . . .

"Q. Now, the normal operator that has a lease like that, take yourself for instance, the normal prudent operator that had a lease that made that return, would have done further development before this, isn't that right, Tom? A. Yes, and under ordinary circumstances would have, see; he would have.

"Q. But these circumstances that you are talking about, they are not going to correct themselves either? A. No, they won't correct themselves, they have just hindered further development.

Q. But they will be here whether it is three years from now or ten years from now? A. Yes, sir.

"Q. Those same circumstances will be there? A. Yes, sir. Yes, that looks like it ought to have been drilled there; it probably might produce like you say, right down the line.

"Q. As I say, it might be dry, but taking the overall picture, it looks like an ordinary prudent operator would have developed it further long ago? A. With a well immediately south of the one he has, that would have been my suggestion.

"Q. In fact, that is your own suggestion? A. Yes.

"Q. And how long ago did you make that suggestion? A. Well, that is if I were suggesting, Harold, but then we had talked about it. He had talked to me about it, and these other things of course, entered into it which is bad, and he has thought some about it might be possible to arrange some with them some way where they will cancel part of their override, so he can go with further development.

"Q. If I understand correctly, Tom, what you are saying, Mr. Mason hasn't refused to or hasn't failed to develop because it didn't look like it should be developed, but because of the fact that he got himself in a bind on overrides? A. That is partly it. Now, he went ahead, of course, with his second well there and it failed, and that was discouraging and the well to the east, made a little. Of course, that was rather discouraging, but not so much of course as the one he drilled, and with the lesser interest, as he did have, it has been a question, I think whether or not it would be justified expenditure, but he would like to get his capital back, his investment back. Ordinarily he would have, see.

"Q. Well, this well has produced enough oil? A. Yes, it has produced enough.

"Q. And the circumstances are here, regardless, taking into consideration, forgetting the fact that he has got these overrides that was his fault, but taking the picture of the present situation out there, the lease, the well that has been drilled on it, the oil has been produced from it; a reasonable prudent man would have developed before this? A. There would have been at least one more well there; yes, sir.

"Q. (By attorney for defendant). You would have done it yourself? A. Without the overrides, I must bring that in, without the overrides, oh yes, you take a well that has made the oil that has.

"Q. (By the Court). Have you had conversations with, or correspondence with Mr. Mason in which he has told you why he hasn't developed this well? A. Oh, we have hashed over that. We have talked about that, Your Honor.

"Q. And is what you have said here with respect to his reasons for not developing based on your conversations and correspondence with him? A. Yes. It is unfortunate."

Mr. R. L. Brinegar, called by defendant as a witness, testified that he had been in the oil business since 1916; had drilled two wells on the area in question; that he did not qualify as an expert on the area and did not know whether there should be a further development on the lease in question; that before he could say that it would be necessary for him to work out the elevations of the present wells, check the present logs of the wells, and have other information which he did not possess; that he did not have any geology run on the acreage in question, and that he did not know anything about its geology.

"Q. (By attorney for plaintiff.) Mr. Brinegar, then if I understand you correctly, if it is just a one well is all the location there is on there, there would be no harm done to the lessees to just cancel the balance of the lease? A. I wouldn't think so.

"Q. In other words, see if I get you right; with the situation like it is, if the man doesn't want to develop, then it is your opinion that it should be released? A. Well, it seems to me as to—I will answer that this way: It seems to me as though that he has had sufficient time to determine whether it would be profitable to drill additional wells there. I think any operator that has had several years of experience, he would definitely have that in mind.

. . . . . . . . . . . . . .

"Q. So the fact there is one purportedly dry hole on this lease actually it does not condemn it all, it just condemns the area right under it? A. The five and a half inches, the width of the hole then; yes."

We think the court in reaching its finding No. 2 may have been influenced by its finding No. 1 to the effect that the lease contained no implied covenant for further development during the primary term of the lease, which we find to be erroneous. The court may have been somewhat influenced by the three-sixteenths overriding royalties outstanding. Plaintiff was not responsible for that situation. Defendant himself sold those overriding royalties, or at least took the lease subject to them. He alleged in his answer that "it was financially impossible for him to drill additional wells as long as said overriding interest was outstanding." The lapse of time alone will not get rid of them. If it is true, as defendant alleged and in effect testified, that he cannot operate this lease with financial profit as long as the overriding royalties exist it simply means he cannot further develop the lease.

Counsel for appellant is correct in saying that under the testimony of all the witnesses who knew anything about it, being two called by plaintiff and one by defendant, the lease should have been further developed. There is no suggestion in the record or in the briefs of counsel that these witnesses were not competent, that they lacked experience or information, or that they were biased or prejudiced in any way. In such a situation the court was not justified in making a finding directly contrary to the only testimony bearing upon the subject. In 20 Am. Jur. 1030, the rule is thus stated:

"Generally, testimony given by a disinterested witness, who is in no way discredited by other evidence, to a fact within his own knowledge, which is not in itself improbable or in conflict with other evidence, is to be believed; and in many cases it is said that the facts so given are to be taken as legally established."

In 32 C. J. S. 1089 the general rule is thus stated:

"Uncontroverted evidence should ordinarily be taken as true, and uncontradicted evidence which is not improbable or unreasonable cannot be disregarded, even if it comes from an interested witness, and, unless shown to be untrustworthy, is conclusive; but evidence not directly contradicted is not necessarily binding on the triers of fact, and may under proper circumstances be given no weight, as where it is inherently improbable or unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence."

Each of these authorities continues with a lengthy discussion of the subject, citing many authorities. Without discussing the authorities in further detail we think the court was not justified in making a finding directly in conflict with the testimony.

Counsel for defendant cite but two cases—*Fischer v. Magnolia Petroleum Co.*, previously cited herein, and from which we quoted the first two paragraphs of the syllabus. In that case, which in its general purposes is similar to this, a judgment for the plaintiff was reversed because the trial court had not taken into consideration the governmental limitations or restriction of production, or marketing. The lease was situated in a "pool" of crude oil, as defined by G. S. 1949, 55-603, and the governmental regulations authorized by that and related sections in the statute authorized production from the well of only 1.44 percent of the well's potential capacity. There is no such situation here.

The other case cited is *Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810. That was an action by the lessor for damages. Two oil bearing formations had been found in the well. Plaintiff's contention was that the operator should have handled the well differently with respect to the two oil bearing stratas. The court held:

". . . (a) that exploration and development of the deeper oil-bearing formation and the deepening of a gas well in the shallower oil-bearing formation, and the conversion of such gas well into a combination oil and gas well, would not have been profitable to the lessee, or that profitable operation would have been highly speculative; (b) that if any damage resulted from failure to more seasonably explore and develop the shallower oil-bearing formation, the extent of such damage was too speculative and conjectural to afford a reasonable basis for measurement."

The judgment of the trial court adverse to plaintiff was affirmed. We think neither of these cases has any specific bearing upon the questions here presented.

It seems clear plaintiff is entitled to relief substantially in harmony with the prayer of his petition and his testimony.

The judgment of the trial court should be reversed with directions to enter an appropriate decree that unless the defendant Mason commences another well on the leased premises by the first day of October, 1952, and completes the same as soon as is reasonably possible, and further develops the lease in good faith as a prudent operator should do for the mutual benefit of the lessor and the lessee, the lease shall be cancelled as to all the leased premises except ten acres immediately adjoining and including the producing well now on the leased premises. The trial court should retain jurisdiction to see that the decree is carried out.

It is so ordered.

PRICE, J., concurs in the result.

WEDELL, J. (concurring in part and dissenting in part): In my view this is an important but not a difficult case. In the light of other pressing duties and without time to analyze and review cases I shall state my general views on the subject of the cancellation of oil or gas leases such as the instant one *during the primary term.* I know there is some slight conflict in the decisions. My views are based upon what I regard as the sounder decisions and the weight of authority and are limited strictly to cancellation during the primary term of a lease contract such as the one before us.

The first question is what relief did the plaintiff seek in this suit? I cannot agree with the statement in that respect contained in the first paragraph of the court's opinion. The petition plainly alleged plaintiff had demanded additional development during the primary term, the lease owner failed to comply with the demand and that plaintiff was entitled to cancellation of the lease. The relief prayed for was cancellation of the undeveloped portion of the lease. It was not for an order requiring further development or cancellation in the alternative. The court denied cancellation during the primary five-year term. From that judgment plaintiff appeals. This court is reversing the trial court and holding plaintiff was entitled to cancellation during the primary term of the lease. Inconsistent directions in the body of the opinion will receive attention presently.

In the trial court's memorandum opinion it stated it would deny the request for cancellation during the primary term of the lease but plainly indicated a different situation might arise after the expiration of the primary term. With that statement I agree.

The real question is whether we should reverse the trial court's

refusal to forfeit, during the primary term, the undeveloped portion of the lease. I shall first consider the contract of the parties before dealing wth the equitable doctrine of implied covenants. The instant lease provides:

"It is agreed that this lease shall remain in full force for a term of five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

Two wells were drilled. The first continues to be a producer in paying quantities. The second was a dry hole. There was no drainage of the lease by other wells. Under other provisions the lease owner was not obliged to drill any well during the primary term but was privileged to pay rentals of $1 per acre or $160 annually in lieu of drilling. The lease contains another significant agreement, which reads:

"If the lessee *shall commence to drill a well within the terms of this lease or any extension thereof,* the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil or gas, or either of them, be found in paying quantities, *this lease shall continue and be in froce with the like effect as if such well had been completed within the term of years herein first mentioned."* (Our italics.)

The term first mentioned was five years.

From these provisions it is clear the lease owner, under the plain agreement of the parties, might have started drilling the first well near the end of the primary term or even during an extension thereof, if granted. He was not required to complete any well during the primary term. If a well was merely commenced during such term, or any extension thereof, and oil or gas was found in paying quantities the lease remained in full force and effect the same as though a well had been completed during the primary term. These provisions constitute the contract of the parties. Not only one but two wells were drilled during the primary term.

Did the fact the lease owner, without contractual obligation, completed the drilling of two wells during the primary term to the substantial benefit of the plaintiff compel the lease owner to drill additional wells during the primary term? I do not think so. Was the penalty for failure to drill wells, not required by the contract, forfeiture or cancellation of all the undeveloped portion of the lease? If so the lease contract, in my opinion, was utterly meaningless.

Does the fact some witness or witnesses believed, if they owned the lease, they would drill additional wells, nullify plaintiff's contract with the lease owner? If so I am not aware of the rule. Any

testimony that the drilling of two wells during the primary term did not constitute development of the lease could not vitiate the express terms of the contract on which the parties had agreed. It is well to remember there is no contention here of fraud or mistake in the execution of the lease contract.

The trial court's memorandum brief discloses that in denying cancellation during the primary term it also considered all other circumstances in addition to the provisions of the lease contract, previously mentioned.

That court, in part, said:

"The lessee's (the working) interest had at the time of the trial recovered the drilling costs on both wells from the production from the first well and some $3,500.00 besides, as compared to royalties received by the plaintiff of $4,711.00 from his one-eighth."

The district court further said:

"The acreage is not large and the field is not one of intensive development or large production. There is no substantial production on near-by acreage to warrant expectations of spectacular or even tempting results. There are no off-set wells through which the minerals are being lost to those not entitled to them. The lessee has made a substantial investment and has made the property productive, more so to the lessor than to himself. His development has been conservative and more consistent with conservation than with waste. The initial term has not expired. The lessee expects to develop further when time seems prudent. Perhaps his present decision may be influenced somewhat by his overriding royalty obligations, but his policy does not seem unreasonable or presently detrimental to the lessor. All of these considerations are important."

It, of course, is conceded that the fact a lease owner has reduced his income from production by granting overriding royalties on his working interest does not constitute a defense to a failure to drill additional wells, *if such additional wells are required by the contract.* But where additional wells are not required, during the primary term, as here, the subject of overriding royalties cannot control or determine the basic problem here presented. It is wholly immaterial why the lease owner did not explore and develop the entire lease, or more of it, during the primary term when he was relieved from doing so by the lease contract. The trial court, however, considered the matter of overriding royalties together with other circumstances, as previously indicated. I am convinced this court should not reverse the decree denying cancellation during the primary term.

Forfeitures for failure to comply with implied covenants are not

favorites of the law. Conditional cancellation during a primary term might be a proper remedy under some circumstances notwithstanding the terms of the lease contract, as for example, in the case of drainage by wells on adjacent land which is not the case here. But surely the equities in favor of cancellation should be clear and compelling in order to override and invalidate the express terms of a contract fairly and intelligently made.

This lease does not contain, and plaintiff does not contend it contains, a provision for reasonable exploration and development of the land during the primary term. Plaintiff therefore must and does rely solely on so-called implied covenants to explore and develop the lease during such term irrespective of the contrary terms of the lease contract concerning the duty of the lease owner to drill during that term. As heretofore stated the only relief plaintiff sought was outright cancellation during the primary term. His prayer is clear and unmistakable. It reads:

"Plaintiff prays that the oil and gas mining lease executed on the 4th day of June, 1947, . . . except for ten acres in square form immediately surrounding the one producing oil and gas well thereon, be cancelled, set aside and held for naught, and that said defendants be ordered and directed to release the same of record; and that in the alternative the decree of this court operate as a cancellation and release of said lease in so far as the same covers the last above described tract of land; that plaintiff have judgment for his costs herein expended and such other and further relief as may be just and equitable in the premises."

It is crystal clear plaintiff did not seek additional development during the primary term but was demanding cancellation and *any additional relief* to which he might be entitled. That is the relief the district court denied *during the primary term*. That is the decision this court reverses. (See syllabus.) I am not willing to reverse the decision of the district court on the single issue presented to it where the decision is based on an accurate analysis of the terms of the lease and the evidence as that court had a right to interpret it.

I also pause to observe plaintiff's declared right to cancellation during the primary term, in my opinion, is contrary to the common operative interpretation of leases of this character by both lessors and lessees over a long period of years. The decision renders literally hundreds of oil and gas leases so interpreted and operated subject to cancellation.

This, as previously stated, is an important decision. It purports to be based on an equitable doctrine that a landowner is entitled

to have the lease reasonably developed during the primary term, *if the lease owner undertakes to drill and obtains one producing oil well during such term,* instead of paying rentals. The right to cancellation is declared to be equitable notwithstanding the fact the producing well provides a much more substantial return to the landowner than payment of annual rentals. In other words, the decision means the lease owner, in equity, is to be penalized for having provided a much greater return to the landowner out of production during the primary term than the parties agreed the landowner was entitled to demand.

But this is only part of the inconsistency of the right to a decree of cancellation on equitable grounds presently announced. Let us pursue this so-called equitable doctrine with a view of ascertaining whether its practical application reasonably may be expected to redound to the benefit of landowners. Although it may temporarily have that effect in those limited cases where a lease owner has already drilled one or more wells under a similar lease, the effect of the decision in the long run, in my opinion, will operate squarely against the interest of landowners generally.

Many lease owners who have contemplated drilling one or perhaps a few wells during the primary term, in harmony with the desire of landowners, will be obliged to refrain from doing so, to the detriment of the landowners, until near the end of the primary term. The reason is obvious. It costs money, big money, to drill oil and gas wells now. The cost of the instant producing well was $15,633.10 and that of the second, a dry hole, was $9,250.43, the total drilling cost alone being $24,883.53. And that is a very small amount in comparison with the cost of many wells, yet a substantial outlay for the average man. The small independent oil operators, of whom we have a great many in this state, who have acquired a lease or two but whose initial finances are too limited to permit them to drill a large number of wells during the primary term will be compelled to postpone drilling operations until near the end of the primary term with the hope of acquiring sufficient capital in the meantime from other sources in order to enable them to continue development after drilling the first well. The result is landowners will be deprived completely of royalties during the primary term, whether it be five, ten or more years. Here the annual rentals to which the landowner was entitled were only $160. His royalty from the one producing well was $4,711.07. The net profit of the working interest, deducting costs of drilling and operation, was only $3,590.95.

If instead of canceling the lease the lease owner is permitted to drill one or a few wells during the primary term, and if he succeeds in obtaining a producer or two, he is benefiting landowners immediately and he also may acquire sufficient capital from operations during the primary term to enable him to continue development with reasonable diligence after such term has expired. This is the well known history of hundreds of small operators in this state who have materially aided landowners by providing them some royalty immediately and much greater returns after the primary term.

The decision that plaintiff was entitled to cancellation during the primary term is the most staggering blow that could be dealt to the small independent oil and gas lease operators in this state. I likewise have no doubt experience will prove the decision will not, over the long run, inure to the benefit but will result in substantial loss to landowners generally. Its effect is to reduce competition in the development of leases. Only the large oil and gas interests and others with substantial reserve capital will be able to proceed with development after drilling one well during the primary term. The decision in the long run can benefit only the latter. They are not required to start drilling operations until near the end of the primary term. Naturally they will not do so unless it is to their own interests irrespective of the interest of landowners. They can afford to pay rentals and postpone development while the operator with small means needs to obtain some production out of which he may finance further development after the primary term. These are only some of the practical considerations which, in my judgment, do not support a decree of cancellation on equitable grounds during the primary term. This is true even if the benefit of landowners alone were considered which, of course, never has been the rule. The test always is one of mutual benefit.

Moreover, in my view, this court is also entirely inconsistent with its own decision and opinion in which it reverses the trial court for failure to cancel the lease during the primary term.

Let us see what the final decree of this court really is. Does this court now cancel the lease in harmony with its decision reversing the trial court? Not at all. The primary term expired June 4, 1952, after the appeal was perfected. This court now, even after the primary term has expired, grants the lease owner additional time beyond the primary term within which to proceed with development. But such final decree in this case is made no part of the law of the case. (See syllabus.) The legal effect of this court's final

decree is that the lease *will not be canceled* if the lease owner within the time therein stated commences another well and proceeds with due diligence to develop the lease in good faith as a prudent operator for the mutual benefit of the parties. (See concluding paragraph of court's opinion.)

My views may be summarized as follows:

*First.* The trial court's finding No. 1 was:

"1. That under the terms and provisions of the lease in question, there is no implied covenant for further development during the primary term of the lease."

If the trial court by this finding intended to say the doctrine of implied covenants to develop cannot be applied during the primary term of a lease irrespective of the facts and circumstances that may arise, the statement is inaccurate.

*Second.* The trial court's second finding was:

"2. That even if there should be such an implied covenant, defendant has, under the circumstances and conditions set out in the evidence operated the lease in a manner sufficiently prudent to avoid the cancellation sought here."

This finding presents the real question for our review. Appellant's counsel are commendably frank about that fact. They concede the only relief sought from the trial court was forfeiture of the undeveloped portion of the lease and that the relief sought was not an alternative decree for additional development or cancellation. They admit that is the only issue on appeal. They further frankly admit they know of no case in this state in which an outright decree of forfeiture has been granted during the primary term but nevertheless contend it should be decreed. My view on that point, briefly stated, is: The district court had the right and it was its duty to take into account all the facts, including the mutual interest of both parties, and not merely those of the landowner whose money would not be risked in experimental exploration; there had been no abandonment of the lease; the lease owner desired to engage in further development as soon as he felt able to do so; although the evidence possibly disclosed some tardy development the lease owner had made a substantial investment; the lease was not being drained by any surrounding production; under the circumstances the income from royalties to the landowner was not lost but only deferred; the evidence was not sufficiently strong to compel this court to reverse the trial court's refusal of immediate and outright forfeiture; the decision of the trial court should, therefore, be affirmed and not reversed.

*Third.* Obviously it is entirely unnecessary to labor the last preceding point. This court's own action, its final decree, granting additional time for development before decreeing cancellation, constitutes a clear recognition of the correctness of the trial court's refusal to decree outright forfeiture.

*Fourth.* It is my opinion paragraph 1 of the syllabus of the court's opinion is entirely too broad as a general statement of law, *first,* because it completely ignores the possible terms of lease contracts, pertaining to development during the primary term, and *second,* it nullifies an express agreement of the parties under the instant lease. If a lease owner drills a well he thereby starts, he "undertakes to develop the leased premises," irrespective of whether his operations result in a producing well or a dry hole. The parties have a right to contract concerning the effect of an undertaking to develop during the primary term. They did so here. The lease provides:

"Should the first well drilled on the above described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rentals and in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments."

True the first well here was a producer but paragraph 1 of the syllabus is not limited to a producing well. The mere undertaking of development under the terms of the instant lease could not justify invoking the equitable doctrine of implied covenants to continue drilling during the primary term and clearly discloses the statement in syllabus 1 is too broad.

*Fifth.* Failure alone to continue drilling, after discovery of a producing well during the primary term, does not, in equity, compel outright forfeiture of the undeveloped portion of leased premises without regard to the terms of a lease contract and the facts of a particular case.

*Sixth.* On the single issue of outright forfeiture presented to the district court appellant is not entitled to an alternative order from this court directing further development or cancellation. In *Greenwood v. Texas-Interstate P. L. Co.,* 143 Kan. 686, 56 P. 2d 431, the action was filed almost two years after the primary term of the

lease had expired seeking forfeiture of the undeveloped portion of the lease. Notwithstanding paragraph 1 of the syllabus in that case, quoted in the majority opinion, this court affirmed the trial court's refusal to decree a forfeiture. This court also refused to make an alternative order for further development or forfeiture for the reason the only relief sought in the district court was cancellation. It said:

"Although not urged by appellant, the question arises whether the court should have made an order that lessee either extend development or surrender parts of the leased premises which it does not desire to develop. There are perhaps two answers. One is that appellant did not seek such an order." (p. 694.)

*Seventh.* Since a majority of this court has now concluded to adopt a different rule in the instant case and has decided to go beyond the single issue presented to and decided by the trial court I, of course, am bound by such decision. Under these circumstances my concurrence is limited to the concluding paragraph of the court's opinion granting the lease owner additional time to develop before decreeing a forfeiture. However, under the decision of this court the judgment of the district court should not be reversed but affirmed and modified as directed.

*Eighth.* The granting of overriding royalties on the working interest of a lease owner, thus reducing his income from production, does not alone constitute a ground for forfeiture but properly may be considered by a court of equity in connection with the terms of a lease and all other facts and circumstances in determining its decree.