Ralph **SLAATEN, individually and as Attorney in Fact for Austin Peterson, Raymond Peterson and Doris Peterson, Plaintiffs and Appellants,**

v.

**AMERADA HESS CORPORATION, a foreign corporation, Defendant and Appellee.**

Civ. No. 890331.

Supreme Court of North Dakota.

July 31, 1990.

Evans & Moench, Ltd., Bismarck, for plaintiffs and appellants; argued by E.J. Rose.

Fleck, Mather, Strutz & Mayer, P.C., Bismarck, for defendant and appellee; argued by Gary R. Wolberg.

ERICKSTAD, Chief Justice.

Austin Peterson, Raymond Peterson, and Doris Peterson, through their attorney-in-fact, Ralph Slaaten, [hereinafter Petersons], appeal from a judgment entered upon an order dismissing the Petersons' request for cancellation of their mineral lease with Amerada Hess Corporation [Amerada] and upon a jury verdict finding that Amerada acted as a prudent operator in preventing drainage of the Petersons' leasehold. We affirm.

In 1949 the predecessors-in-interest of the Petersons and Amerada executed an oil and gas lease for the following 1280 acres of land in McKenzie County:

"Township 154 N. Range 95 W.

Section 31—Lots 2, 3, 4, 5, 6, & SE¼SW¼, S½SE¼

Section 32—Lots 7 & 8, & S½SW¼

and all accretions directly north of Lots 2, 3, 4, & 5 of Section 31; and Lots 7 & 8 of Section 32 up to the south bank of the Missouri River."

The land underlying the lease includes the Madison, Devonian, Silurian, and Red River formations. After oil was discovered in the Madison formation, the North Dakota Industrial Commission established the Charlson–Madison North Unit for the Madison formation and the Petersons had participating wells on their land in that unit. The Charlson–Madison North Unit did not include accretions north of the Petersons' land and up to the Missouri River which were included in the 1949 lease. Other wells were subsequently completed in the Devonian and Red River formations on land adjacent to the Petersons' land. The Petersons did not participate in those wells.

The Petersons subsequently sued Amerada, alleging that the wells in the Devonian and Red River formations were draining their land and seeking damages for breach of an implied covenant to protect against drainage. The Petersons also sought cancellation of the lease, alleging a breach of Amerada's implied covenant of reasonable development and further exploration.

The Petersons moved for partial summary judgment, seeking cancellation of the lease for the accretions north of their land and up to the Missouri River. The Petersons argued that the accretions were not in the Charlson–Madison North Unit and the lease was null and void because of Amerada's failure to comply with Section 38–08–

09.8, N.D.C.C., as amended in 1983.[1] The court denied the Petersons' motion, concluding that the 1983 amendment to that statute could not be applied retroactively to impair prior obligations of the parties.

The court granted a jury trial on the Petersons' claim for damages for breach of an implied covenant to protect against drainage but denied the Petersons' request for a jury trial on the cancellation issue. After a trial on the drainage claim, the jury returned a special verdict finding that Amerada had acted as a prudent operator.

The Petersons then sought a trial on the cancellation issue or, in the alternative, to "allow the parties to brief such issues not only on the law but the evidence and testimony introduced and received by the court during the recent jury trial on the bifurcated issue of damages." Based on the evidence and testimony offered at the jury trial, Amerada submitted a brief requesting summary judgment on the cancellation issue. The Petersons resisted, contending that the "evidence at the jury trial and the testimony of witnesses disclosed that [the Petersons were] entitled to cancellation." The court inquired whether the parties would submit additional evidence on the cancellation issue but received no direct response from them. The court then noted that the jury found that Amerada operated the oil and gas lease as a prudent operator under all the facts and circumstances of the case and concluded that it could "think of no compelling reason for [it] to reach a different conclusion as a prelude to the request for cancellation." The court determined that cancellation was inappropriate.

On appeal the Petersons contend that the court erred in refusing to allow them to introduce exhibit number 36 during the jury trial. They assert that the court's refusal to allow the introduction of that exhibit precluded their expert petroleum engineer, Dois Dallas, from presenting his opinion on drainage from their land.

Exhibit 36 was Exhibit A in case 4680 before the North Dakota Industrial Commission on March 8, 1989. In that case Texaco requested an exception in the Charlson–Devonian Field so that it could drill a well within 1000 feet of a well owned by Amerada and within 3000 feet of the Petersons' land. Dallas testified that the exhibit was not prepared by him but that he obtained it from Texaco's attorney at the Industrial Commission hearing. Dallas further testified that he did not know if the document had become part of the Industrial Commission records. Amerada objected to the introduction of the exhibit on the grounds of lack of foundation and hearsay, and the court sustained the objection.

Whether or not an exhibit should ·be excluded for lack of adequate foundation is primarily within the sound discretion of the trial court and will not be disturbed on appeal in the absence of a showing that the exclusion affected a substantial right of the party. *Ned Nastrom Motors, Inc. v. Nastrom–Peterson–Neubauer Co.*, 338 N.W.2d 64 (N.D.1983); Rule 103(a), N.D.R. Evid. The Petersons have not argued or demonstrated that the foundation for the admissibility of exhibit 36 was adequate, and we cannot say that the trial court abused its discretion in refusing to allow that exhibit into evidence.

Moreover, although Dallas was not allowed to testify as to the contents of the exhibit, he was not precluded from relying upon the exhibit to form his opinion on drainage of the Petersons' land. The court's comment that an expert "needs to

1. Section 38–08–09.8, N.D.C.C., with the 1983 amendment underscored, provides in part:

"Nothing herein or in any plan of unitization may be construed as increasing or decreasing the express or implied covenants of a lease in respect to a unit source of supply or lands not included within the unit area of a unit. *However, when an oil and gas lease covers and affects lands partially within and partially without the unit area, unit operations and unit production allocated to the lease, as* *provided in this section, may not be deemed operations on or production from the lease as to the lands covered by the lease lying outside the unit area after two years from the effective date of the order of the commission creating and approving the unit or the expiration of the primary term of the lease, whichever is the later date. After the later date, the lease as to lands outside the unit area may be maintained in force and effect only in accordance with the terms and provisions contained in the lease."*

rely on admissible information"[2] was made during discussions about another exhibit, which was ultimately admitted into evidence, and was qualified by its statement that "[t]he fact that it's a document that he relied on in giving his opinion does not make the document admissible." The court further explained its ruling on exhibit 36 after the Petersons' offer of proof of Dallas' testimony[3]:

"THE COURT: Okay, the objection was to the exhibit itself, not to Mr. Dallas' opinion or the reasons given for that opinion. I kept out Exhibit 36 because it is hearsay and that's the only thing my ruling pertains to is keeping out the exhibit itself. I think it is hearsay. Okay Mr. Dallas, on your way down would you just hand the exhibit up to me and I will put it back in the file again to preserve it."

Dallas opined that wells in the Devonian and Red River formation were draining the Petersons' land, and the Petersons were not precluded from presenting that opinion in their case in chief or further developing that opinion during Dallas' rebuttal testimony. The Petersons' argument to the contrary is meritless. We conclude that the exclusion of exhibit 36 did not preclude Dallas from relying on that exhibit to form his opinion on drainage of the Petersons' land.

The Petersons also contend that the trial court erred in refusing to cancel the lease. They allege that Amerada breached its implied covenant of reasonable development and further exploration.

2. Rule 703, N.D.R.Evid., provides:
"RULE 703. BASES OF OPINION TESTIMONY BY EXPERTS
"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."* [Emphasis added.]

3. The Petersons made the following offer of proof:
"MR. ROSE: Mr. Dallas, Plaintiffs' Exhibit 36 was offered the other day in evidence and not admitted. What I want to do is make an offer of proof which simply means that if it would be admitted this is what you would testify to on it and will you now please explain to the Court what this exhibit means to you, why it's important in your summary and conclusions that you have made and whether or not this exhibit does not substantiate your previous opinion? That's Plaintiffs' Exhibit 36.
"A Your Honor, this is exhibit A in case number 3680 before the Industrial Commission of the State of North Dakota dated March 8, 1989, is an exception location request by Texaco in the Charlson Devonian Field. Exhibit B is a Charlson Devonian pool map, McKenzie County, North Dakota. It's a structure contour map on top of the Devonian Duperow Formation. The particular well that Texaco is asking for an exception at that hearing had previously been drilled to the Silurian below the Devonian and that well had not be [sic] completed in the Silurian because they did not think it would be economical to produce it. But now they are going to the Commission and saying they would like to have an exception from this proper location which was the Devonian Unit number 3, which had already been drilled, had produced 112,000 barrels of oil, only 43,000 barrels of water, and so they want to move over to this Silurian well which directly offsets instead of being the on pattern well which would put it a mile away it's now going to be one-half a mile away from Amerada's Volkman Devonian Unit number 1 and the replacement well that they drilled two wells Amerada well they originally drilled and probably because of casing collapsed or some reason they redrilled it and those two Devonian wells have made on this exhibit they have made 1,200,000 barrels of oil from that Devonian. The exhibit also shows that out of these 29 Devonian wells nine of them have been exception locations. In my opinion not only was the 320 acres spacing rectangular spacing not a reasonable way to develop this field, but there are two wells this one and the one up in section five only some 3,000 feet from the Peterson land. Those two wells have both produced more than a million barrels of oil and the other wells in the field have produced a lot less oil individually but in my opinion there's no way that any competent engineer can say that any of those wells is not draining oil from the entire reservoir wherever that reservoir is and in my opinion a portion of it is under the Petersons' lands.
"Q Does this exhibit buttress your conclusion that you arrived at prior to the date of this hearing which was March 8, 1989?
"A Yes, they do.
"Q Does it bear out what you have previously testified to as to the drainage and things like that?
"A Yes."

In *Olson v. Schwartz*, 345 N.W.2d 33, 38 (N.D.1984), we said:

"It is well settled that the lessee of an oil and gas lease has an implied obligation to the lessor to do everything that a reasonably prudent operator would do in operating, developing, and protecting the property, with due consideration being given to the interests of both the lessor and the lessee, if there is no express clause in the lease relieving the lessee of this implied duty. *Feland v. Placid Oil Co.*, 171 N.W.2d 829, 835 (N.D.1969). *See also* 38 Am.Jur.2d *Gas and Oil* § 127, page 601."

The burden of proving a breach of an implied covenant is on the party asserting it. *Olson v. Schwartz, supra.* Whether or not an operator has met the standard of a prudent operator or breached its implied covenant of reasonable development of a leasehold are questions of fact which are subject to the clearly erroneous standard of Rule 52(a), N.D.R.Civ.P. *Johnson v. Hamill*, 392 N.W.2d 55 (N.D.1986).

In *Olson v. Schwartz, supra*, 345 N.W.2d at 39–40, we listed a number of factors relevant to the prudent operator standard:

"(1) the quantity of oil and gas capable of being produced as indicated by prior exploration and development; (2) the local market and demand therefor; (3) the extent and results of the operations, if any, on adjacent lands; (4) the character of the natural reservoir—whether such as to permit the drainage of a large area by each well; (5) the usages of the business; (6) the cost of drilling, equipment, and operation of wells; (7) the cost of transportation, storage, and the prevailing price, and (8) general market conditions as influenced by supply and demand or by regulation of production through governmental agencies.

"We add to these factors evidence of the willingness of another operator to drill on the tract in question, *Berry v. Wondra*, 173 Kan. 273, 246 P.2d 282 (1952); the attitude of the lessee toward further development, *McMahan v. Boggess*, 302 S.W.2d 592 (Ky.1957); and the

elapsed time since drilling operations were last conducted. *Texas Consolidated Oils v. Vann*, 208 Okl. 673, 258 P.2d 679, 680 (1953). See also Martin, *A Modern Look at Implied Covenants to Explore, Develop, and Market under Mineral Leases*, 27 Institute on Oil & Gas Tax Law and Taxation 177, 181–182 (1976)."

In this case the Petersons had the burden of proving a breach of an implied covenant of reasonable development. *Olson v. Schwartz, supra.* The Petersons essentially relied upon the evidence admitted at the jury trial and did not accept the court's invitation to submit further evidence. Although the precise issue involved in the jury trial, drainage, was different than reasonable development and further exploration, Amerada presented evidence during the jury trial concerning the history of development of the Petersons' leasehold and the surrounding land. There was testimony concerning wells that had been drilled on, or in the vicinity of, the Petersons' land and the results of those wells. The court heard testimony about a dry well on the Petersons' land and the poor results of a well drilled near their property. There was evidence that, in the opinion of Amerada's experts, there were no economically recoverable hydrocarbons in known structures under the Petersons' lease. The court also heard evidence that Amerada is pursuing further exploration through a seismic program to determine whether there are undiscovered structures under the leased lands. Although reasonable development and further exploration are not the same issues as drainage, and the court's findings on reasonable development and further exploration are not as precise as we would like, we believe that, in view of the evidence offered at the jury trial and the Petersons' failure to present any further evidence, the court's finding that Amerada acted as a prudent operator is sufficient to include reasonable development and further exploration. The court was cognizant of the record on reasonable development and further exploration, and its

finding that Amerada acted as a prudent operator is not clearly erroneous.[4]

■ The Petersons also claim that the 1983 amendment to Section 38–08–09.8, N.D.C.C., (see fn. 1) allows them to cancel the lease as to accreted lands which are not in the Charlson–Madison North Unit because that land has not been developed. The 1983 amendment was not expressly made retroactive and does not apply to land leased in 1949 and left outside the Charlson–Madison North Unit in the 1960's. Section 1–02–10, N.D.C.C.; *Reiling v. Bhattacharyya*, 276 N.W.2d 237 (N.D. 1979).

■ Finally, the Petersons contend that the court erred in allowing Amerada costs for their out-of-state employees who testified at trial. The allowance of disbursements lies within the discretion of the trial court and will not be overturned on appeal unless the trial court, which is in a better position to determine the reasonableness and necessity of the disbursements sought by the prevailing party, abuses its discretion. *Richter v. Jones*, 378 N.W.2d 209 (N.D.1985). The trial court did not abuse its discretion.

The judgment is affirmed.

VANDE WALLE, LEVINE, MESCHKE and GIERKE, JJ., concur.

---

**4.** In *Johnson v. Hamill, supra,* 392 N.W.2d at 61, we quoted with approval from *Shell Oil Co. v. Howell,* 208 Okla. 598, 258 P.2d 661, 665 (1953), the following cautionary statement about reasonable development:

" '[O]ur decision herein should not be interpreted as licensing the defendant to do nothing in the near future toward further development of the lease.' "