No. 35,749

ALVIN FISCHER, *Appellee*, v. MAGNOLIA PETROLEUM COMPANY, *Appellant;* FRED K. ENTRIKEN, *Appellee.*

(133 P. 2d 95)

Opin-ion filed January 23, 1943.

*R. C. Russell,* of Great Bend, argued the cause, and *John Henry Lewis, Isabel Obie,* both of Great Bend, *George C. Spradling* and *George Stallwitz,* both of Wichita, were on the briefs for the appellant.

*Morris Garvin,* of St. John, argued the cause, and *Evart Garvin* and *Harry G. Wiles,* both of St. John, were on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action to cancel an oil and gas lease for

violation of an implied covenant to develop, after expiration of the primary term. Plaintiff was owner, by purchase subsequent to the giving of the lease, of a portion of the tract covered by the lease. The appeal is by the lessee, defendant, from an order overruling its demurrer to the plaintiff's evidence. The question is whether plaintiff's evidence was sufficient to establish a right to cancellation.

On December 6, 1928, R. C. Gates and wife gave an oil and gas lease on three quarter sections of land which they owned in Stafford county. The tract consisted of the north half of section 35 (full description immaterial), and the southeast quarter of section 34, which adjoins section 35 on the west. The lease was for a primary term of ten years, expiring on December 6, 1938, and for as long thereafter as oil or gas should be produced from the land. The Magnolia Petroleum Company, the appellant, became holder of the lease by assignment from the original lessee. The agreed rentals were paid until about June 20, 1938, when a producing well—the first well drilled under the lease—was brought in. On June 19, 1929, about six months after the lease was executed, Alvin Fischer, the appellee here, bought from Gates the south half of the southeast quarter of section 34 and as such owner received his share of acreage rentals until the expiration of the primary term in December, 1938. The producing well is on a ten-acre location in the northwest quarter of the northwest quarter of section 35. The only other drilling done by the lessee on the three quarters covered by the lease was on a ten-acre location immediately south of the producing well location. A well was there completed, as a dry hole, on October 5, 1938. It will be noted that the northeast corner of the Fischer eighty was five-eighths of a mile south of the southwest corner of the ten-acre location containing the producing well, and one-half mile south of the ten-acre tract where the dry hole is located.

Fischer received no part of the royalty from the producing well. Whether his failure to share in royalty was due to the fact that the lease contained no "entirety clause" (frequently inserted to provide for development of the original tract as a unit and apportionment of royalty among owners of separate parcels of the original tract) is not disclosed by the record and no question of royalty rights is here at issue. No drilling having been done on his eighty acres Fischer brought action against Magnolia to cancel as to his land, on May 3, 1941—two years and five months after his receipt of rentals ceased, and two years and seven months after the dry hole was completed.

Formal averments of the petition need not be recited. Plaintiff alleged that the completion of a producing well in the northwest corner of section 35 "does not comply with the duties of the defendant . . . to drill an oil well or wells and to produce oil on the real estate owned by the plaintiff"; that "it is inequitable and unjust for the defendant . . . to hold four hundred and eighty (480) acres of land beyond the expiration of the primary term of the original lease by one (1) producing well. And that it is inequitable and unjust for the defendant . . . to refuse further development for oil and gas purposes upon the real estate owned by the plaintiff . . . beyond a reasonable time after the expiration of the primary term," and that "the defendant has had approximately three years in which to develop the premises owned by the plaintiff"; that he had made demand upon the defendant to develop his land but that the defendant had refused to do so; that such refusal was given in a letter from the defendant, dated March 14, 1941 (to which further reference will presently be made). The prayer was for cancellation, and for statutory damages and for attorneys' fees in the total sum of $350, under the provisions of G. S. 1935, 55-202. By exhibit, the lease was made a part of the petition.

By answer and amended answer the defendant admitted plaintiff's ownership of the eighty acres in question, admitted the lease, admitted the completion of the producing well, alleged that the plaintiff purchased his land with both actual and constructive notice of the lease and of its terms, that none of the covenants of the lease either express or implied had been violated, that "the leased premises have been developed in such manner as would be required of an ordinarily prudent operator under similar conditions"; that it had drilled a second well on the premises which was completed as a dry hole on October 5, 1938; that it was its intention to "develop the said lease in a prudent and businesslike manner to the interests of all the parties concerned" and "to undertake and promote further development of the property just as soon as circumstances shall be such that an undertaking of drilling of additional wells and the further development of said lease would be prudent or necessary, taking into consideration alike the interests of the lessor and lessee"; that "during the past few years, there has existed in the oil industry a condition wherein the potential production is greatly in excess of the market demand; that, in order to conserve petroleum and insure the ultimate maximum production from oil-producing formations,

the governments of the United States and of the various states have adopted measures to control and restrict production of petroleum to meet the market demand; . . . that, as a part of the policy and plan of conserving petroleum resources, the state of Kansas has enacted proration and conservation laws restricting new development and regulating the production of existing wells; and that, under and by virtue of the said proration and conservation laws, wells of considerable potential capacity are permitted to produce only a fractional part thereof . . . that it is not required, as a reasonable and prudent operator, to conduct additional development on the said premises at this time."

The reply was a general denial.

Most of the facts hereinbefore stated were agreed to, by stipulation. It was further stipulated that under the proration orders of the corporation commission wells in the pool involved were limited in their production to 1.44 percent of their potential capacity, and as of December, 1941, to 1.45 percent. It was further agreed that defendant's exhibit 1 (to which reference will later be made) might be considered in evidence for the purpose of showing the cost of production and income from the producing well. Defendant's exhibit of a plat, showing the tracts involved, adjacent tracts and location of producing wells and dry holes was also admitted by stipulation.

Plaintiff was the only witness. He testified to conversations with a Mr. Hughes, a representative of the defendant, the first one being in the last of January, 1939. He said that at that time he asked if they would take the lease off the record and Mr. Hughes said that as far as he knew they were going to hold it for production; that he saw Hughes again in February or March, 1939, and was told that the company was going to keep the lease for production; that he saw Hughes again the latter part of September or first part of October and after some argument told him that "if they didn't bring in a well and make a new lease" he would bring suit against them; that he saw him again in March, 1940, and asked if they had changed their minds and Hughes said he didn't think so but would take it up with them; that in about three weeks Hughes called to tell him the decision hadn't been changed; that he saw Hughes again the last part of February, 1941, and was told that the same decision stood but that he would again—and within fifteen days—secure word from the company. Within the fifteen days plaintiff received the following letter:

"DEAR MR. FISCHER:

"We have been advised of your demand for a release on or before March 15, 1941, of the above oil and gas lease. There is a producing oil well on this lease and we have also drilled a dry hole thereon.

"The geological and production departments have carefully considered this matter and have come to the conclusion that further development at this time is not justified and we must, therefore, respectfully decline to release this lease.

"Yours very truly,

"MAGNOLIA PETROLEUM COMPANY,

By J. S. HUGHES,

JSH:JM

J. S. HUGHES."

To this evidence the defendant demurred. The demurrer was overruled and the appeal followed.

Before considering the evidence, in the light of applicable principles of law involved, one or two matters should be noted. The plaintiff did not allege that there were any producing wells immediately adjacent to his land on any side; that there had been any drainage of oil from his land or that there was any threat of such drainage. He did not allege any violation by lessee of obligation to drill offsetting wells. The plat showed no producing well within a half mile of plaintiff's land but showed a dry hole on a ten-acre location an eighth of a mile north of the northwest corner of his land. The plaintiff made no claim for damages other than as heretofore stated.

Appellee's right to development is no greater than the original lessor would have had as to appellee's eighty acres. The lessee's obligation to develop could not be increased—nor would it be lessened—by division of ownership of the tract subsequent to the making of the lease. (15 C. J. 1259; *Thiessen v. Weber*, 128 Kan. 556, 561, 278 Pac. 770.) That elementary principle has a bearing upon the question of prudent development of the whole tract covered by the lease.

We now consider the implied covenant to develop, upon which appellee solely relies. The cases involving the question are legion and while we have reviewed not only all of our Kansas decisions on the question as well as many from other jurisdictions we think it unnecessary to discuss the doctrine at length. It may frankly be conceded that our own decisions are not wholly harmonious, though such lack of harmony as may appear will be found, upon analysis, to arise in large part at least from an emphasis placed upon isolated sentences from opinions, or from failure to give due weight to divergence in factual situations involved. Some of the differ-

ences perhaps may be accounted for by the fact that through comparatively recent years there has been, generally, a shifting of emphasis from *production* to *conservation* of our natural resources. This trend, evidenced by conservation and proration statutes and in other ways is so well recognized as to require no comment. Courts naturally reflect this trend by stressing the mutual interests of both lessor and lessee rather than the special interest only of the lessor in securing production.

As to the first or exploratory well the time within which it must be drilled is usually fixed in the lease itself. Frequently there are also specific provisions as to the drilling of additional wells. In the instant case we are dealing only with the obligation of further development after a producing well has been completed and acreage rentals have ceased. It is well established that in such a case there is an implied covenant to develop further, unless otherwise provided in the instrument itself. (2 Summers on Oil & Gas, Per. ed., p. 333, and cases cited, footnote 68; 24 Am. Jur. 568; *Brewster v. Lanyon Zinc Co.*, 140 Fed. 801, and authorities cited.) The cases are replete with pronouncements as to the extent of this implied covenant. Some of the cases—particularly earlier ones—hinged this obligation upon the *good faith* of the lessee. In other words, the burden was upon the lessor asserting violation of the covenant to show that the lessee had not acted in good faith. (See Summers on Oil & Gas, Per. ed., pp. 387-393, and cases there cited and discussed.) This "good faith" rule, however, has never been recognized in this state and is not followed generally. (2 Summers on Oil & Gas, Per ed., pp. 393, 394, and cases there collected.) The latter cases are, generally, in substantial harmony as to the standard to be applied in measuring the duty of the lessee under the implied covenant. The following passages—often quoted—are from an opinion by the Circuit Court of Appeals for the Eighth Circuit in the case of *Brewster v. Lanyon Zinc Co.*, supra, coming up from this state:

"The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. . . . There can, therefore, be a breach of the covenant for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith.

"But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor

and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry' the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. . . *Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required.*" (p. 814.)

In *Sauder v. Mid-Continent Petroleum Corp.*, 292 U. S. 272, 78 L. Ed. 1255, a case which also went up from this state, the United States supreme court quoted with approval the above passages from *Brewster v. Lanyon Zinc Co.*, and commented: "This definition of the scope of the implied covenant has been generally adopted in decisions of federal and state courts." (Citing cases. See footnote 2, 78 L. Ed. 1259.) It has been said that some of our decisions, particularly some earlier ones, are out of harmony with that rule. Analysis of those cases would unduly extend this opinion. Suffice it to say that in most cases such statements as appear contrary to the rule, lose much of their authority when viewed in the light of the particular facts and issues involved. In any event, the doctrine is now well established in this state that what is required of a lessee, under the implied covenant to develop, is reasonable diligence in doing what would be expected of an operator of ordinary prudence, in the furtherance of the interests of both lessor and lessee. The rule was firmly approved in the late case of *Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810 (citing many cases and authorities not necessary to repeat here, see pp. 295, 296). Among the cases there cited is *Greenwood v. Texas Interstate P. L. Co.*, 143 Kan. 686, 56 P. 2d 431, in which will be found an analysis of various cases which had been cited in support of a contrary view.

In *Myers v. Shell Petroleum Corp.*, supra, it was said:

"The large expense incident to exploration and development, combined with the fact the lessee, and not the lessor, must bear the loss of unsuccessful exploration and development, justifies the lessee in proceeding with reasonable caution and with a proper regard to his own interests, as well as those of the lessor. A lessee is under no implied duty to engage in an undertaking which is unprofitable to him, although it might, or would, result in some profit to the lessor. . . . It is only to the end of mutual benefit or profit to both lessor and lessee that reasonable diligence is required." (pp. 295, 296. See many authorities there cited. Also collected cases, 2 Summers on Oil & Gas, Perm. ed., p. 368, footnote 29.)

It has generally been recognized that in determining whether there is prudent development under the lease there are various pertinent factors to be considered—all the facts and circumstances which would affect the reasonableness of an ordinarily prudent operator's position in connection with development of the particular tract involved. (2 Summers, Oil and Gas, Perm. ed. 377, 378; 2 Thornton, Oil and Gas, pp. 836, 837, and footnote 76.) In *Brewster v. Lanyon Zinc Co.*, supra, the circuit court of appeals said:

"Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market or demand therefor or the means of transporting them to market, the extent and results of the operations, if any, on adjacent lands, the character of the natural reservoir—whether such as to permit the drainage of a large area by each well—and the usages of the business." (p. 814.)

Among other such economic facts to be considered have been listed "cost of drilling, equipment and operation of wells, . . . cost of transportation, cost of storage, prevailing price . . . *general market conditions as influenced by supply and demand or by regulation of production through governmental agencies.*" (2 Summers, Oil and Gas, Perm. ed., pp. 377, 378.)

A lessor who alleges breach of the implied covenant to develop has the burden of showing, by substantial evidence, that the covenant has been breached. He must prove that the lessee has not acted with reasonable diligence under the facts and circumstances of the particular situation. (24 Am. Jur. 661; 2 Thornton, Oil and Gas, 858, and cases cited, footnote 177; 2 Summers, Oil and Gas, 367, 368.) As stated in Summers, *supra*, "this is nothing more than a statement that the lessor plaintiff must allege and prove the elements of his case." Summers states the rule succinctly as follows:

"The lessor has satisfied his requirements of allegation and proof, if he alleges and proves such facts and circumstances as will establish that a reasonably prudent and experienced oil operator, with full knowledge of all such facts and circumstances, in the exercise of ordinary care, would have drilled additional wells on the land with a reasonable expectation of producing oil or gas therefrom in paying quantities." (Summers, *supra*, pp. 370, 371, and cases cited, footnote 31.)

Before examining the instant record in the light of these principles we take note of appellant's contention that in any event appellee was not entitled to the equitable relief of cancellation in the absence of a showing that a remedy by damages was inadequate.

In view of the conclusion hereinafter stated, on the substantive issue of prudent development we shall not extend this opinion by discussion of the question of whether proper foundation was here laid for invoking equitable relief. Suffice it to say that there has been an increasing recognition of the fact that it is extremely difficult, if not impossible, for the lessor to compute damages, or even to establish a measure of damages sustained by lessee's failure to develop. (*Webb v. Croft*, 120 Kan. 654, 244 Pac. 1033.) We pass to the primary issue.

What, then, was the evidence upon which appellee sought to establish breach of the covenant? It may fairly be said to consist of only two facts or circumstances, namely, that about two years and seven months had elapsed since the second well, a dry hole, had been completed on the tract, and that the lessee had refused to drill on appellee's land located more than half a mile from the dry hole and more than five-eighths of a mile from the producing well. Since appellee had received his share of the rentals for nine years and until rentals ceased upon completion of a producing well, he could have no complaint of delay during that period. Upon the issue of refusal to develop appellee relies upon the letter hereinbefore set out, the material part of which reads: "the geological and production departments have carefully considered this matter and have come to the conclusion that *further development at this time is not justified.*" (Italics supplied.) In addition to this testimony it was stipulated that wells in the pool were permitted, under proration orders of state authorities, to produce only 1.45 percent of their potential daily production. Also, that there were no producing wells on any land adjacent to appellee's land. There was also admitted, by stipulation, appellant's exhibit to show the cost of production and the income derived by appellant from the producing well. This exhibit purported to show an expenditure of $56,711.04 in investment costs and operating expenses, as against receipts of $33,613.25 from sale of oil, leaving a net loss of $23,097.79 as of September 30, 1941—about three years and three months after completion of the producing well.

Giving this evidence its most favorable interpretation we must conclude that it constituted no substantial showing that the lessee had breached an implied covenant for prudent development. Appellee failed to sustain the burden of proof resting upon him. The mere fact that no well had been drilled on plaintiff's land—more

than a half mile from production—for two and a half years is no proof that an operator of reasonable prudence, with regard for the interests of both lessor and lessee, would have drilled, under the existing facts and circumstances. Nor can we interpret appellant's letter as an abandonment of the lease. Appellant simply stated that it did not consider further development *"at this time"* to be justified under the geological and production circumstances then existing. If such a decision on the part of a lessee—unquestioned by any evidence on the part of the lessor—were to be held tantamount to abandonment, the requirement that the plaintiff sustain the burden of proof as to prudent development would cease to have meaning. The appellee introduced no evidence whatever relating to any of the economic and other facts which bear upon the issue of prudent development. The only evidence along that line—supplied by appellant and admitted by stipulation—certainly did not furnish any basis for holding that an ordinarily prudent operator would drill at that time on appellee's eighty-acre tract. One of these economic facts was the current limitation of production, under state order. Such restrictions upon production, under lawful orders of either federal or state authority are certainly pertinent factors to be considered along with other economic factors, on an issue of prudent development. (2 Summers, Oil and Gas, Perm. ed., pp. 377, 378, and footnote 39.) To hold otherwise would be wholly illogical as well as being manifestly unfair. And it should be noted that in the instant case there was no contention that the lessee might have avoided, in any way, the limitation imposed by proration orders.

It would be wholly gratuitous for us to speculate upon the sort of evidence which appellee might have submitted to show lack of prudent development. The cases are replete with recitation of testimony on such an issue. For instance, in the recent case of *Myers v. Shell Petroleum Corp.*, supra, there was a vast amount on both sides, bearing upon that issue. Appellee submitted no testimony whatever upon the question, but relied solely upon the lapse of two and a half years and refusal of the lessee to drill at that time on the eighty acres involved.

It has been said that in some of our cases a lessor's right to cancellation has been upheld simply because the lessee was unwilling—for *any* reason—to proceed with development. We think that an analysis of the statements so interpreted—made in the light of facts involved—would demonstrate that such a generalization is wholly

unwarranted. And little could be said for the soundness of such a holding. Of course, if the lessee has clearly indicated by word or conduct that he regards the tract not worth developing, at any time, it may well be held that he has abandoned the lease, and that such abandonment calls for forfeiture and removal of the encumbrance. But to say that the mere refusal by a lessee to proceed immediately with development is alone sufficient, under the usual lease contract, to entitle the lessor to cancellation would be to announce not only a strangely illogical doctrine but one clearly involving impairment of contract. Plainly a lessor who seeks relief, whether in law or equity, for breach of the implied covenant to develop *must show that the covenant has been breached before he is entitled to a judgment of any sort.* Obviously, the applicable law cannot all be compressed within an ultimatum to lessee to "develop now, or surrender the lease." The essential question persists—has the implied covenant been breached, is the lessee refusing to proceed with reasonable diligence to develop as an ordinarily prudent operator would do?

One statement seized upon as sanctioning cancellation in any case where the lessee is unwilling, for any reason, to proceed at once with further development is the comment in *Myers v. Shell Petroleum Corp.*, supra, (p. 296): "Manifestly if the lessee thinks an undeveloped portion of his lease cannot be developed with profit to him he may be required to surrender such portion of the lease. That is not the instant case. This is an action for damages," etc. Properly interpreted that observation, made by way of dictum, does not approve any such broad doctrine as the one above indicated. True, the lessee *"may* be required" to surrender, *provided always that there is substantial evidence to show lack of prudent development.* It by no means follows that he may be required to surrender in the absence of any testimony whatever that any ordinarily prudent operator would proceed differently.

It would unduly extend this opinion to review all cases cited by the parties, or even the Kansas cases alone. We shall only note briefly a few of our own cases upon which appellee largely relies.

Appellee stresses *Harris v. Morris Plan Co.*, 144 Kan. 501, 61 P. 2d 901, in which a judgment of forfeiture for breach of covenant to develop was affirmed. In that case, decided in 1936, the lease was executed in 1925 and one producing well completed in 1927 which produced until 1934. No other well had been drilled on the two

hundred acres. There was evidence showing development on three sides of plaintiff's land and the court also had before it what had been done—or not done—to develop during the primary term, and testimony that lessee was "unwilling to make further development *until a certain price had been reached.*" Furthermore, in the Harris case the case of *Greenwood v. Texas-Interstate P. L. Co.*, supra, was quoted with approval, wherein the lessor's right to forfeiture for failure to develop was denied and in which the proposition was repeatedly stressed that the implied covenant is that development must be continued "with reasonable diligence and along such lines as are reasonably calculated to make extraction of oil and gas from the leased lands of *mutual advantage and profit to the lessor and lessee.*" (Italics supplied.) (Syl. ¶ 1.)

In *McCarney v. Freel*, 121 Kan. 189, 246 Pac. 500, affirming forfeiture, the lease was executed in 1912 and a producing well completed the same year. A dry hole was completed in November, 1917, and no further drilling. The action was brought in 1926. There was evidence that "numbers of producing wells have been drilled and are in operation on all the surrounding land," and the producing well completed on the tract fourteen years before was still producing. Moreover, in his answer the lessee contended "that *development of the land surrounding plaintiff's quarter section was such* that further drilling on her tract was not warranted." From this the inference was clear that the lessee had no intention of ever drilling on plaintiff's land. That is far from the instant case.

*Nigh v. Haas*, 139 Kan. 307, 31 P. 2d 228, in which cancellation was affirmed, presents an involved state of facts which we need not recite. Suffice it to say that the lessee did nothing to develop, over fifteen years, and it was said in the opinion (p. 312): "Defendants did not care to spend the money necessary to drill the wells. They stood by and permitted someone else to do so. Now that the lease has proven valuable, defendants are asking that they receive the benefit of the expenditure of money and efforts of those who did think there was oil and gas under this lease." No comment is necessary to distinguish such a case from the one we have here.

We note briefly, in conclusion, *Webb v. Croft*, supra, decided in 1926 and to which reference has already been made. The lessee, under an oil and gas lease, had drilled only *one gas well on* 580 acres during the ten years the lease had been in effect and had drilled *no oil wells*, although oil wells had been completed by others

on land in the vicinity. Even as to market for gas there was evidence which controverted the lessee's testimony. The opinion approved the doctrine that the reasonable development required by the implied covenant is "such as will protect the interests of both the lessor and the lessee." (p. 657.)

The conclusion already stated makes it unnecessary to consider that part of the judgment awarding statutory damages for refusal to release a "forfeited" lease (G. S. 1935, 55-201, 55-202) and for attorneys' fees. Appellee did not predicate right to relief upon any statute but solely upon alleged breach of the implied covenant.

It follows from what has been said that the trial court erred in overruling defendant's demurrer to the plaintiff's evidence, and that the judgment must be reversed with directions to enter judgment for the defendant. It is so ordered.

PARKER, J., not participating.

HARVEY, J., dissents.