No. 41,785

H. L. RENNER and WILMA RENNER, His Wife, and M. J. RENNER, *Appellees*, v. MONSANTO CHEMICAL COMPANY, a Corporation, and LION OIL COMPANY, a Corporation, *Appellants*.

(354 P. 2d 326)

Opinion filed August 4, 1960.

Gerald Sawatzky and George B. Powers, of Wichita, argued the cause, and Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Anthony T. Dealy, Donald L. Cordes and Robert L. Howard, all of Wichita, and Wayne McCaslin, of Stockton, were with them on the briefs for appellants.

D. A. Hindman, of Stockton, argued the cause, and Stanley Krysl, of Stockton, was with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: This was an action by the landowners to cancel an oil and gas lease on a 20-acre tract of a quarter section leasehold for violation of the implied covenants to fully develop the premises and to protect it against drainage by wells on adjoining land. Trial was by the court which found in favor of the plaintiffs. An alternative decree was entered giving the defendants, Monsanto Chemical Company, a Corporation, and Lion Oil Company, a Corporation, the right to file with the clerk of the district court their intention to comply with the decree within 30 days, and to drill, complete and equip a well within 120 days from the date of the decree, or, in default of performance, the oil and gas lease covering the 20-acre tract stand as canceled. In lieu of performance, the defendants appealed from the decree and the order overruling their motion for a new trial.

Plaintiff H. L. Renner owns the Northwest Quarter of Section 5, Township 10 South, Range 20 West, Rooks County, Kansas, hereafter referred to as the Renner quarter or lease. Plaintiff M. J. Renner owns 1/16 of the oil, gas and other minerals in and under

the property. Plaintiff Wilma Renner has an inchoate interest in the land as the wife of H. L. Renner.

On September 2, 1946, the plaintiffs executed an oil and gas lease covering the Renner quarter to A. M. Jennings who assigned it to the defendants. The instrument was a standard form commercial lease designated as Producers 88 4-43 B (Kansas), and was duly recorded. Among other provisions it contained the following:

"All express and implied covenants of this lease, both before and after production is obtained upon the lease premises, shall be subject to all Federal and State laws, executive orders, rules and regulations. . . ."

In September 1948 the defendants drilled a test well, Renner No. 1, and completed it as a commercial oil producer on October 26, 1948. Within the next three months six more wells were drilled, one being a dry hole. An eighth well, a producer, was drilled in August 1951. The eight wells were drilled on locations selected by the defendants.

W. E. Baldwin owns the Southwest Quarter of Section 5 lying immediately south of the Renner quarter, which is leased to the Sinclair Oil & Gas Company. In November 1948, approximately two months after Renner No. 1 was completed, Sinclair completed an offset well, Baldwin No. 1, located 660 feet south of Renner No. 1. In February 1949 Sinclair completed Baldwin No. 2 located 330 feet south of the south line of the Renner quarter and is the well which plaintiffs contend has drained crude oil from under the tract in question and from which they seek protection. In developing the Baldwin lease Sinclair selected the locations, and drilled a total of eight wells, two being dry.

Section 5 is in the Cooper Field and the following map of that section is set out to assist the reader to more clearly understand the factual situation of this controversy. The 20-acre tract in question is located in the south-center of the south 80 acres of the Renner lease and was described in plaintiffs' petition as the Southwest Quarter of the Southeast Quarter and the Southeast Quarter of the Southwest Quarter of the Northwest Quarter of Section 5. Black dots indicate producing wells and the well numbers assigned by lessee-operators, dry holes are indicated by circles with four short marks and are numbered, and the sub-sea level elevation where each well topped the oil-bearing zone is also shown. The broken lines indicate the location of acreage attributed to each producing well by the State Corporation Commission pursuant to our oil conserva-

tion statute ( G. S. 1949, 55-601, *et seq.,* as amended ).  As indicated, the acreage of the east half of the Renner quarter was attributed on "triangular" 20-acre spacings and the remaining acreage of both leases was attributed on "rectangular" 20-acre spacings.  The solid line in the north half of the northeast quarter of the Renner lease

indicates a 20-acre tract "farmed out" by the defendants after this action was commenced in 1958 to the Kaiser-Francis Oil & Gas Company which drilled well No. C-1 in the center of the tract and obtained a 160-barrel per day well in the early part of 1959.

Natural gas is not encountered in the Cooper Field and oil is produced from the Arbuckle Formation which has an erosional

surface and channels with sharp features. Contour maps of both parties indicate that the formation underlies a part of the west half of Section 5. It traverses the Renner quarter in a north-south direction but veers in a southwesterly direction across a part of the Baldwin quarter, making 101.4 productive acres on the Renner lease and 94.4 acres on the Baldwin lease, or a total of 195.8 productive acres in the half section. For all practical purposes, with slight variations, 1600 feet subsea level is considered the bottom plane of the formation and the productive section of the oil-bearing zone is the difference between 1600 feet subsea level and the top of the formation at each well location as shown on the map. The high point of the structure tends to center under the tract in question as indicated by the following: proceeding easterly from Renner Nos. 6 and 2 and Baldwin No. 2 the formation slopes slightly downward to Renner No. 1 and Baldwin No. 1 where it continues to slope downward and dissipates on the adjoining property immediately east of the offset locations of those two wells. It also dissipates a short distance east of Renner No. 8, making Renner No. 4 a dry hole. Northward from Renner Nos. 6, 5 and 2 the formation slopes downward until a short distance south of No. C-1, the "farm-out" well, where it is higher than Renner Nos. 7, 3 and 8. Immediately west of Renner Nos. 6 and 7 and Baldwin Nos. 2 and 5 the formation drops sharply as evidenced by datum from completion information on three dry holes—Baldwin No. 8 and two wells on adjoining property offsetting Renner Nos. 6 and 7. The Arbuckle Formation was not reached at Baldwin No. 8, one location west of Baldwin No. 2. In the short distance between Renner No. 6 and the offset location to the west, the formation drops 143 feet, evidencing the sharpness of its features. North from that offset location to the offset location west of Renner No. 7 the severity of the erosional situation is further evidenced because, again, no Arbuckle depth was reached. While the expert testimony was conflicting, the district court found that, "The Arbuckle lime underlying said 20 acre tract is structurally as high, and in all probability higher, than any part of the Renner or Baldwin property."

The reservoir energy of the Cooper Field is essentially "water drive." That term simply means that when a barrel of oil is taken out of the oil-bearing portion of the reservoir a barrel of water moves in to replace the oil and no drop in bottom hole pressure

results. However, in this case, there was a loss of bottom hole pressure of the wells on the Renner and Baldwin leases because the water did not move in fast enough to replace the oil, hence, the water drive was only partially effective in maintaining reservoir pressure.

When completed, the four wells on the south Renner 80 and three wells on the north Baldwin 80 were maximum wells having bottom hole pressure of 1350 pounds. Renner Nos. 1, 2 and 6 originally produced 3,000 barrels per day and Renner No. 5 produced 2332 barrels per day. Baldwin Nos. 2 and 3 had initial production of 3,000 barrels per day and Baldwin No. 1 originally produced 2380 barrels per day. Thus, the 20-acre tract is located in the very center of the original high potential production of that part of the Cooper Field. However, when this lawsuit was tried, tests made in the Renner wells indicated there was a loss of reservoir energy of approximately 84 percent causing a decline in daily production to the following: No. 1, 27 barrels; No. 2, seven barrels; No. 5, five barrels, and No. 6, 31 barrels. Daily production from the four north Baldwin wells likewise declined, but not so great: No. 1, 20 barrels; No. 2, 30 barrels; No. 3, 30 barrels, and No. 5, fifteen barrels. As of April 1, 1959, 601,283 barrels of oil had been produced from the Renner lease and 529,669 barrels had been produced from the Baldwin lease, further evidencing loss of reservoir energy. Thus, because the Renner wells have produced for a longer period of time and more oil having been withdrawn, the water drive being only partially effective, reservoir pressure tends to be lower than under the Baldwin lease.

In November 1956 and January 1957 plaintiffs requested the defendants to drill a well on the 20 acres in question, or surrender the lease on that tract. The defendants declined. Plaintiffs made two formal demands, in April and in May, 1958, for the commencement of a well on the tract within 30 days, or that the lease be released. In May and in June, 1958, the defendants again declined, contending it was unnecessary they do either. Shortly thereafter this action was commenced.

Briefly summarized, the plaintiffs alleged: That oil had been and was being drained from the tract in question from the time of the completion of Baldwin No. 2 in February 1949; that a prudent operator would have drilled a well on the 20-acre tract within a period of not exceeding four months after the completion of Baldwin No. 2;

that the defendants' acts in failing and refusing to drill a well were deliberate, without just cause, and in reckless disregard of the rights of plaintiffs; that the damage they suffered could not be accurately measured and in any event would not adequately compensate them; that the oil and gas lease covering the 20-acre tract should be canceled, and that the defendants should be granted no alternative relief.

Answering, the defendants admitted no well had been drilled on the tract, but denied that a well should be drilled thereon or that there had been a breach of any implied covenants, and in particular the implied covenants to fully develop the lease and to protect the premises against drainage, and that there had been no undue or any uncompensated drainage from any part or portion of the Renner lease. Further, that should the court find a breach of the implied covenants occurred, it enter an alternative decree permitting them to cure and rectify such a breach, and offered to comply with any reasonable order.

Further answering, the defendants alleged that under the proration laws of the state of Kansas and the proration orders promulgated by the State Corporation Commission, and specifically the "Oil Proration Order and Report, Table 'B' Fields-Pools," the commission attributed all of the acreage of the Renner and Baldwin leases to the producing wells thereon by 20-acre well spacings, as indicated on Exhibit A (see map), and particularly, that 20 acres was attributed for allowable purposes to each well on the south half of plaintiffs' quarter section, thus making all of that acreage attributed to the four producing wells; that by reason thereof the lease was fully developed and that a reasonable prudent operator would not, under the same or similar circumstances, drill further wells on the south half of the quarter or on the 20-acre tract in question. The prayer was that the relief sought by the plaintiffs be denied, and that the defendants be decreed to be the owner of a valid and subsisting oil and gas lease covering the Renner quarter.

The plaintiffs' reply denied the new matters alleged, but admitted that the producing wells and dry holes on the Renner lease and surrounding acreage were correctly located on the plat attached to the defendants' answer as shown on Exhibit A.

On those principal issues the parties' evidence consisted of their stipulations and testimony of two expert witnesses for each side. In its memorandum opinion the district court made extensive find-

ings of fact and conclusions of law. It found that no well had been drilled on the tract in question; that oil was being drained and had been drained therefrom since the completion of Baldwin No. 2 or shortly thereafter, it being impossible to determine the exact quantity but the same constituted substantial drainage; that a prudent operator would have drilled a test well on the 20-acre tract within a period not to exceed four months after the completion of Baldwin No. 2 and at all times since that date; that the Arbuckle Formation underlying the 20-acre tract contained oil or crude petroleum in substantial quantities, a large amount of which could not be drained by the four wells on the south Renner 80, and that unless a well was drilled on the 20-acre tract a considerable quantity of oil would remain unproduced which could otherwise be produced and would be sufficient to return the operator his cost of drilling, the operation thereof, all miscellaneous expenses, and would provide a substantial profit in addition to paying the landowner ⅛ royalty. The court further found that if the lease was canceled on the 20-acre tract a prudent operator would not only drill a well on the tract, giving the usual ⅛ royalty, but, in addition, would give the plaintiffs an overriding royalty of at least 1/32 of ⅞ of the production.

In its conclusions of law the district court determined that plaintiffs had no adequate remedy at law and were entitled to a cancellation of the oil and gas lease covering the Renner quarter insofar as it pertained to the 20-acre tract in question, or, in the alternative, a development of that area as heretofor indicated; further, that the orders of the State Corporation Commission did not "restrict nor relieve the obligations of the implied covenants of an oil and gas lease." Hence, this appeal.

The defendants first attack the findings that oil was being drained from under the 20-acre tract in a substantial amount, and that it would be profitable for a prudent operator to drill a well thereon. They argue that uncompensated drainage means oil moving across a lease line in only one direction, and, while conceding that Baldwin No. 2 might have produced *some* oil from off the 20-acre tract, they contend there has been no uncompensated movement because the uncontradicted evidence was that the Renner wells were drilled before the Baldwin wells; that during the early period of heavy production there must have been substantial drainage from the Baldwin lease *toward* and *into* the 20-acre tract; that because the

Renner wells produced earlier and for a longer period of time their present production is, on the average, lower per well than that from the wells on the Baldwin lease; that the four Renner wells surrounding the tract drawing oil from under it have reduced the pressure in the perimeter of the 20 acres; that because oil tends to migrate toward wells having the lowest relative pressure, the oil under the 20 acres moves to the Renner wells; that within a reasonable time 46.5 percent of the original oil in place will be produced by the existing wells, and that, under the circumstances, a reasonable prudent operator would not drill an additional well. They further argue that the four Renner wells are located within 330 feet from the tract while only one well on the Baldwin lease is that close, and since the reservoir pressure is lower under the Renner lease more oil will be produced by the Renner wells than by Baldwin No. 2. Consequently, considering all the known physical characteristics of the leases and that the defendants' expert witnesses were more qualified because they made the more exhaustive and detailed study of all relevant factors in contradistinction to plaintiffs' expert witnesses who admitted their lack of foundation evidence, the court's findings here discussed are without foundation and not supported by substantial evidence. Sheared of inconsequentials, the contention infers that because Sinclair is gentlemanly about operating Baldwin No. 2 and will produce only one-fifth of the oil under the tract while the defendants' four wells will ultimately recover the other four-fifths, the plaintiffs should not complain.

The doctrine of implied covenants of oil and gas leases has prevailed in this jurisdiction since the discovery of oil and gas, and our decisions are numerous canceling leases for violations of implied covenants upon the ground that it is extremely difficult, if not impossible, for the lessor to compute damages, or even establish a measure of damages, sustained by a lessee's failure to continue development or to protect the premises against drainage (*Culbertson v. Cement Co.*, 87 Kan. 529, 125 P. 81; *Elliott v. Oil Co.*, 106 Kan. 248, 187 P. 692; *Webb v. Croft*, 120 Kan. 654, 244 P. 1033; *McCarney v. Freel*, 121 Kan. 189, 246 P. 500; *Thiessen v. Weber*, 128 Kan. 556, 278 P. 770; *Nigh v. Haas*, 139 Kan. 307, 31 P. 2d 28; *Berry v. Wondra*, 173 Kan. 273, 246 P. 2d 282; *Christiansen v. Virginia Drilling Co.*, 170 Kan. 355, 226 P. 2d 263; *Wagner v. Sunray Mid-Continent Oil Co.*, 182 Kan. 81, 91, 318 P. 2d 1039).

In evolving the doctrine of implied covenants courts have placed great emphasis on individual property rights and construed oil and gas leases "to promote development and prevent delay" upon the theory that the lessor had the right to have his land developed as rapidly as possible (*Temple v. Continental Oil Co.*, 182 Kan. 213, 320 P. 2d 1039, opinion denying rehearing, 183 Kan. 471, 328 P. 2d 358; 2 Summers, Oil and Gas, § 371, p. 484; Merrill, Covenants Implied in Oil and Gas Leases, 2d ed., §§ 1, 6 and 7, pp. 15, 26 and 27). To that end, where the lease itself does not contain express provisions creating duties in the lessee to drill exploratory wells; to drill additional wells after discovery; to operate with diligence and market the product if oil and gas are discovered in paying quantities, and to protect the premises against drainage by wells on adjoining leases, the law imposes such duties upon the lessee under the doctrine of implied covenants (*Howerton v. Gas Co.*, 81 Kan. 553, 106 P. 47, 34 L. R. A. [N. S.] 34; *Culbertson v. Cement Co.*, supra, Annotated Cases 1914 A. 610; *Alford v. Dennis*, 102 Kan. 403, 170 P. 1005; *Webb v. Croft*, supra; *Thiessen v. Weber*, supra; *Christiansen v. Virginia Drilling Co.*, supra; *Berry v. Wondra*, supra; Merrill, *op. cit.*, supra, § 4, p. 23; Summers, *op. cit.*, supra, § 395, p. 526). And, there are many other decisions to the same effect.

While early cases of this court indicate that the implied covenant to protect against drainage was intertwined and indistinguishable from the covenant to fully develop (*Betterment Co. v. Blaes*, 75 Kan. 69, 88 P. 555; *Howerton v. Gas Co.*, supra; *Culbertson v. Cement Co.*, supra), it is now well established that the duty to protect against drainage is an independent covenant (Summers, *op. cit.*, supra, § 399, p. 568; Merrill, *op. cit.*, supra, § 94, p. 234).

Generally speaking, the rule of the implied covenants to drill additional wells after discovery and to protect the premises against drainage by wells on adjoining leases is this: under the former, when oil in paying quantities becomes apparent and the number of wells to be drilled on the lease is not specified, there is an implied obligation that the lessee continue development of the property and put down as many wells as may be reasonably necessary to secure the oil for the common advantage of both the lessor and the lessee (*Howerton v. Gas Co.*, supra; *Brown v. Oil Co.*, 114 Kan. 166, 217 P. 286; *Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810; *Fischer v. Magnolia Petroleum Co.*, 156 Kan. 367, 133 P. 2d 95; *Berry v. Wondra*, supra; *Temple v. Continental Oil Co.*, supra).

Under the latter, because of the fluidity of oil and the likelihood of its being withdrawn from the leased premises by the operation of wells on adjoining lands, a rigid duty is imposed upon the lessee to protect the premises from substantial drainage by drilling a sufficient number of wells at points the same distance from the lease boundary lines as are the wells on adjoining lands (*Gillet v. Investment Co.*, 111 Kan. 755, 207 P. 843; *Culbertson v. Cement Co.*, supra; *Howerton v. Gas Co.*, supra; *Harris v. Morris Plan Co.*, 144 Kan. 501, 61 P. 2d 901; *Myers v. Shell Petroleum Corp.*, supra; Summers, *op. cit.*, supra, § 399, p. 568; Merrill, *op. cit.*, supra, § 94, p. 234). Whether a lessee has performed his duties under the implied covenants is a question of fact. In the absence of a controlling stipulation, neither the lessor nor the lessee is the sole arbiter of the extent to which, or the diligence with which, the operations shall proceed. The standard by which both are bound is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both (*Greenwood v. Texas-Interstate P. L. Co.*, 143 Kan. 686, 56 P. 2d 431; *Harris v. Morris Plan Co.*, supra; *Myers v. Shell Petroleum Corp.*, supra; *Fischer v. Magnolia Petroleum Co.*, supra, Syl. ¶ 4; *Temple v. Continental Oil Co.*, supra).

With this rule in mind, the question is: Does the record contain substantial evidence to support the district court's findings? It is well settled that where findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the supreme court's power begins and ends with the determination whether there is any competent substantial evidence to support them, and where findings are so supported they are accepted as true and will not be disturbed on appeal, and in such case it is of no consequence that there may have been much contradictory evidence adduced at the trial which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment (*Dunn v. Madden*, 109 Kan. 94, 197 P. 1116; *In re Estate of Gereke*, 165 Kan. 249, 195 P. 2d 323; *Stoskopf v. Stoskopf*, 173 Kan. 244, 245 P. 2d 1180; *Smith v. Wichita Transportation Corp.*, 179 Kan. 8, 293 P. 2d 242; *Stephenson v. Wallis*, 181 Kan. 254, 311 P. 2d 355; *Davis-Wellcome Mortgage Co. v. Long-Bell Lumber Co.*, 184 Kan. 202, 336 P. 2d 463; *Davis-Wellcome Mortgage Co. v. Long-Bell Lumber Co.*, 184 Kan. 209, 336 P. 2d 469; *Fine v. Telephone & Power Supply Co.*, 185 Kan. 383, 345 P. 2d 616; *Fine v. Neale Construction*

*Co.,* 186 Kan. 537, 352 P. 2d 404; *Dennis v. Smith,* 186 Kan. 539, 352 P. 2d 405).

Highly summarized, plaintiffs' expert testimony was that while the four Renner wells have been taking oil from under the 20-acre tract, they will not capture all the oil under that acreage; that if a well was drilled now in the center of the tract it would recover in the neighborhood of fifty to seventy-five thousand barrels of oil; that there has been drainage from the 20-acre tract by the Baldwin lease; that Baldwin No. 2 has drained a substantial amount of oil from under the acreage attributed to the Renner lease but there were too many undecisive factors to permit a definite opinion as to the amount drained; that an ordinary prudent operator would have drilled a well offsetting Baldwin No. 2 previous to drilling Renner No. 8; that such an operator could drill and equip a well on the tract and operate it at a substantial profit, and that if the lease covering the area in question was canceled, a reputable operator would drill a well on the tract and give the plaintiffs a 1/32 override in addition to the ⅛ royalty.

While the burden of proof was upon the plaintiffs to show by substantial evidence that the defendants had not acted with reasonable diligence under the facts and circumstances (*Fischer v. Magnolia Petroleum Co.,* supra; *Temple v. Continental Oil Co.,* supra), the district court as trier of the facts weighed the testimony of the experts, and our review of the record convinces us that the evidence amply supported the district court's findings that drainage had occurred and was occurring in a substantial amount, and that an ordinary prudent operator would have drilled a well on the tract in question within a reasonable time after Baldwin No. 2 was completed.

We are brought to the main issue. The defendants assert as an impregnable defense that valid orders of the State Corporation Commission issued pursuant to G. S. 1949, 55-601, *et seq.,* as amended, attributing acreage to an owner's producing oil wells prevail against complaints by a landowner of the lessee's breach of the implied covenant to protect the premises against drainage. They argue that when their well spacing pattern was submitted to the commission and it approved their development program and ordered the acreage of the Renner lease attributed in 20 acre tracts to the proration formula of each producing well, no undeveloped spacing units remained and a reasonable prudent operator,

having due regard for the mutual interests of both lessee and lessor and the oil conservation policies of the state, was not required to further develop acreage which was already fully developed, hence, there existed no duty, as a matter of law, to further protect the premises against drainage.

The question has not previously been passed upon by this court and requires a consideration of our oil conservation statute (G. S. 1949, 55-601 *et seq.*, as amended) and its effect on implied covenants of an oil and gas lease. As the issue is here presented, we are not concerned with whether a prudent operator would have drilled additional wells to fully develop the premises or to protect it against drainage since those questions were determined adversely to the defendants and the evidence more than amply supported the findings. The narrow question is whether, as a matter of law, the commission's order attributing the full acreage of the leasehold to each producing well in 20-acre tracts constitutes a finding that the Renner wells would adequately and effectively extract the oil underlying the specific acreage attributed to each, thus relieving the defendants of their duty to further protect the premises against drainage, and precludes the district court from inquiring into the alleged violation of that implied covenant. We are not persuaded. A detailed analysis of the statute is unnecessary since that was done in *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 176 P. 2d 861. Suffice it to say it was enacted to prevent physical or economic waste; to protect correlative rights of producers; to assure ratable taking within a common pool; to prevent discrimination among pools, and the legal device selected to accomplish those purposes is "proration." In its simplest form, proration is the restriction of production of oil by allocating the current market demand among the pools of the state and between the wells of each pool in proportion to their potential production to secure to each producer his fair share of the oil produced from a common reservoir —or, as the statute states, "the respective correlative rights of the producers therein" (*Bennett v. Corporation Commission,* 157 Kan. 589, 595, 142 P. 2d 810).

In its practical application of the statute the commission determines monthly the total market demand for oil produced in the state and equitably prorates that amount among the various pools. G. S. 1957 Supp. 55-604 [since amended], the statute in effect when the order in question was made, reads in part:

". . . (C) In prorating the production allowed to each pool among the wells therein, the commission shall take into consideration, among such other factors as it may find proper, and give due and proper weight to: (*a*) The productivity of each such well as determined by such reasonable method as the commission shall adopt for the pool; (*b*) *the acreage of each well owner which is reasonably attributable to each of his wells;* and (*c*) the efficient utilization of the reservoir energy in the pool. . . ." (Emphasis supplied.)

The commission has limited jurisdiction, and only that conferred by statute (*Bennett v. Corporation Commission,* supra). The statute did not authorize the commission to regulate the spacing of wells or to establish drilling units (1 Summers, *op. cit.* supra, § 83.10, p. 303); it provided only that, in fixing allowables, the commission give consideration, among other things, to the acreage factor, that is, the acreage of an owner which is reasonably attributable to each of his wells. Acreage is attributed to a well primarily for the purpose of protecting correlative rights, and productivity (commonly called potential) and acreage are used in conjunction with each other for the purpose of fixing a well's allowable. The attribution of specific acreage for that purpose does not constitute a finding that the well will adequately and effectively drain the tract assigned to it; it only determines that such a well will adequately drain an area equal to the size of the tract assigned (State Corporation Commission's General Rules and Regulations, 82-2-109 D [I], and Administrative Interpretations *h, j,* and *k,* pp. 23, 24, adopted July 1958 and filed in the office of revisor of statutes [G. S. 1949, 77-405, *et seq.*]). Drainage is always radial from the well bore and where, as here, some 20-acre well spacings bordering the lease line are rectangular and some are triangular and the well on each is not located in the center, physical factors demonstrate that uncompensated drainage will occur.

We think it clear that, from a consideration of the statute, oil proration orders of the commission do not in any manner alter the lessee's obligation under the implied covenant to drill additional wells to protect the premises against drainage. Manifestly, the statute provides no basis for the supersession of that duty, and affords no inference that a landowner must submit to uncompensated drainage without the possibility of exacting protection from his lessee. The duty to drill wells under the covenant is not changed since proration involves only the restriction of production after the wells are drilled.

The purpose of the order attributing specific acreage to the south

four Renner wells was only to establish a proration formula for each well to insure its fair share of the state's market for crude oil produced from the Cooper Field, and it did not constitute a finding that those wells would adequately and effectively drain the acreage attributed, or preclude judicial review of the plaintiffs' claim of a breach of the implied covenant to protect the premises against drainage.

In reaching the conclusion just announced we have examined, not overlooked, the authorities cited by the defendants, but no review of them will be made since, as the defendants concede, they do not control the question presented.

The defendants make the claim that the approval of the 20-acre tract in question as new "drilling unit" will completely distort the existing spacing pattern of acreage attributed by the commission, resulting in disproportionate spacing by which two of the producing wells will be left with fewer than 20 acres. The point is not well taken. The fact that acreage once attributed to an existing well cannot thereafter be attributed to another well unless the commission shall order otherwise does not affect this situation. Under the rules of the commission previously referred to, the completion of a new well on the tract in question would cause only a readjustment of the acreage factor in conformity with the revised status of the lease.

The plaintiffs devote a considerable portion of their brief arguing that justice requires the immediate cancellation of the lease so far as it pertains to the 20-acre tract and that no alternative relief should be granted the defendants. They request this court to review the rule granting an alternative decree for development or cancellation and modify it to such an extent that the landowner be given his choice of remedy, contending that such a holding would prevent oil companies from refraining from properly developing leases, knowing that if a case is established against them they will have an opportunity to protect themselves by doing that which they should have done in the first place. They argue that it is not economically feasible for an ordinary landowner to enforce the implied covenants of a lease against a lessee who has charge of the development and operation of the lease and has at his command the data and technical staff to make a formidable presentation before a court, and that since the breaches of the implied covenants in this case were arbitrary and of the highest degree possible and of a

greater degree than has been heretofore passed upon by this court, outright cancellation should be ordered.

The remedy by alternative decree for development or cancellation was recognized by this court in 1910 (*Howerton v. Gas Co.*, supra), and the precedent has been followed in many decisions. Too rigid an application of its principles may impose unjust burdens upon the lessee. On the other hand, too lenient an application in the lessee's favor may imperil the legitimate claim of the landowner that he receive a just reward for the part his property plays in making the mineral resources available (Merrill, The Public's concern with the Fuel Minerals, pp. 20, 21). No hard and fast rule has been laid down for the application of the remedy, but, generally speaking, it is equitable in nature, and equitable principles must be applied (*Harris v. Morris Plan Co.*, supra, p. 507).

No review of our many cases will be made, and our conclusions are confined to a consideration of the record. Under the facts and circumstances presented, this court would have no hesitancy in ordering the immediate cancellation of the Renner lease as it affects the 20-acre tract if the only question for appellate review was whether the evidence was sufficient to support the district court's findings. The record discloses that in developing the lease the defendants did not conduct themselves as ordinary prudent operators since the tract in question was left unprotected against drainage by offset wells; that the plaintiffs have suffered damages by substantial drainage which they cannot recover because of the impossibility of measuring them, and that the breaches complained of are highly aggravated and have been continued over a long period of time despite the plaintiffs' repeated demands for additional development. Furthermore, while this case does not involve the northeast 20 acres of the lease which the defendants "farmed out" for development, they took no action to protect the plaintiffs rights in that portion of the lease until after this litigation was commenced.

But, those considerations of the record do not dispose of this question. One point remains which compels this court to conclude that the defendants should be permitted, within the time specified, to further develop. It is this: following entry of the alternative decree by the district court the defendants had the choice of another alternative. They could acquiesce in the decree by drilling, completing and equipping a well within the time, however, such acquiescence would preclude appellate review, or, they could waive

alternative relief by foregoing performance and appeal to this court, which was their right to do. Having taken the latter course, the terms of the alternative decree expired and the lease stands canceled on the 20-acre tract in the event the decree of the district court is affirmed unless further relief by this court is afforded the defendants.

Both parties concede the question of law presented for appellate review has not previously been passed upon. For this court to refuse to grant alternative relief would unfairly penalize the defendants for presenting a question of law, which, if sustained, would constitute a defense to the plaintiffs' action. Otherwise, a lessee-operator who was afforded alternative relief would, in effect, be denied his right to appeal.

It is the judgment of this court that the defendants are entitled to an alternative decree in lieu of cancellation of the lease so far as it pertains to the 20-acre tract by complying with the following conditions: (*a*) file their intention to comply with this judgment with the clerk of the supreme court within 30 days from August 4, 1960, and (*b*) drill, complete and equip a well within 90 days from August 4, 1960. Jurisdiction of this controversy is retained by this court to see that the decree is carried out.

As here modified, the judgment of the district court is affirmed.